Karen A. WILLIAMS,
Plaintiff–Appellant,

v.

CERBERONICS, INCORPORATED,
Defendant–Appellee.

Karen A. WILLIAMS,
Plaintiff–Appellee,

v.

CERBERONICS, INCORPORATED,
Defendant–Appellant.

Nos. 88–3971, 88–3984.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1989.

Decided March 21, 1989.

Rehearing and Rehearing In Banc Denied
April 13, 1989.

*cert. denied sub nom. Bolden v. U.S.,* 475 U.S. 1123, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986).

Brian Paul Phelan (Robert V. Varnum, Mary Jean Fassett, Mehler, Frantz, Conlon, Knapp, Phelan & Varnum on brief), for plaintiff-appellant.

Stephen W. Robinson (Michael F. Marino, McGuire, Woods, Battle & Boothe, on brief) for defendant-appellee.

Before WINTER, HALL and PHILLIPS, Circuit Judges.

K.K. HALL, Circuit Judge:

Karen A. Williams appeals the district court's judgment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, that her employer, Cerberonics, Inc., did not terminate her on the basis of race or in retaliation for her filing of a discrimination charge. She also appeals the district court's entry of judgment notwithstanding the verdict ("j.n.o.v.") in favor of Cerberonics on her 42 U.S.C. § 1981 discrimination and retaliatory discharge claims. Finding no error, we affirm.

## I.

Williams is a black female who was employed by Cerberonics, a defense contractor, from July, 1979, until her termination in February, 1983. She was employed as an instructor in Cerberonics' Aviators Breathing Oxygen ("ABO") Program. The Program was under contract with the Navy and its purpose was to maintain and test high altitude breathing apparatus for Navy pilots. Williams' job was to instruct Navy personnel on how to conduct this maintenance and testing. Instruction was conducted in Naval installations and on aircraft carriers around the world.

The ABO Program itself was a small, close-knit operation of between seven to ten employees based in Lexington Park, Virginia. While other black employees worked for brief periods with the Program, Williams was the only black continuously employed in the group from 1979 until mid–1982. Her immediate supervisor in the program was Bernard A. Neuman. Neuman's supervisor was the department manager, Wayne R. Hay. The division manager, the person with ultimate hiring and firing authority in the program, was John R. Ludes. All of these supervisory personnel are white.

It is readily apparent from the record in this case that ill feelings existed between Williams and Neuman. The animosity between the two was attested to by both parties' witnesses. Williams testified that Neuman treated her more demandingly than he did other, white employees. She claimed that he singled her out for criticism, particularly in regard to tardiness in reporting for work and use of the telephone for personal calls. Neuman denied these charges and testified that Williams had a "negative attitude" and was "defiant" to constructive criticism from her su-

periors. Cerberonics produced evidence that other employees were disciplined for abuse of telephone privileges and evidence that Williams' tardiness was chronic. Williams' poor attitude was corroborated by both Hay and Michael Goddard, a white male who was Neuman's assistant. Both of these witnesses, along with Neuman, testified that Williams' attitude infected her relationships with her coworkers.

Williams' difficulties were also reflected in teaching evaluations by her students. Although a majority of the evaluations was favorable, the percentage of unfavorable evaluations that she received was higher than that of her co-instructor. Also, criticisms of her performance became more frequent during the latter part of her tenure.

Moreover, Cerberonics produced a voluminous record of contemporaneously written memoranda documenting numerous incidents of Williams' misconduct. Two of these incidents deserve mention.

In March of 1980, Williams was in Yokosuka, Japan, conducting training on the carrier Midway. A small fire started in her hotel room when one of her bed pillows came into contact with a space heater. Williams became belligerent toward the hotel personnel and refused to acknowledge any responsibility for the incident. As a result, an argument ensued and the situation disintegrated to the point where the local police were called and criminal charges were filed against Williams. Neuman, who was on assignment in the Philippines, had to fly to Japan to apologize to the hotel management and defuse the potentially embarrassing situation.

An equally telling incident occurred in September, 1982, at the Naval base in San Diego, California. There, Williams persisted in parking in an officer's reserved space after Neuman had ordered her not to do so. An unpleasant confrontation resulted where Neuman eventually ordered Williams to return to the home office.

Shortly after the San Diego incident, Hay began to prepare an Employee Change Notice, placing Williams on probation. Although Williams had received a favorable job evaluation as recently as October, 1981,

Hay felt that probation was necessary due to her declining job performance, poor attitude, and difficulty with coworkers. Approximately at the same time, also prompted by the San Diego incident, Williams decided to file a discrimination complaint against Neuman and Cerberonics with the Maryland Commission on Human Relations ("MCHR"). The complaint was subsequently filed on November 4, 1982.

On November 23, Hay and Neuman met with Williams to counsel her over her continued tardiness; however, Hay did not inform her that he was considering placing her on probation. By mid-December Williams' performance had not improved and the final decision was made by Hay to place her on probation. At the time Hay made this decision, he was not aware of Williams' discrimination charge. After the decision was approved by Hay's superiors, she was notified of the probation on January 6, 1983.

The probationary status did little to change Williams' behavior. The record shows that her tardiness became more frequent and her abuse of the telephone continued. Only four days after being placed on probation, she became involved in a shouting altercation with one of her coworkers. One month later, on February 4, 1983, Goddard confronted Williams concerning her continued excessive personal use of the telephone. The situation came to a head two weeks later when Williams was fired after another incident over the telephone.

While at work on the afternoon of February 18, 1983, Williams received a phone call from her attorney. She took the call in an unoccupied conference room. While talking to her attorney, Williams was discovered by Hay. After refusing to tell Hay about the nature of the call, she was ordered to Ludes' office to meet with Ludes, Neuman, and Hay. After repeated questioning from her superiors, Williams finally admitted that the call was a personal one, from her attorney. Ludes immediately suspended her and she was terminated four days later.

Shortly thereafter, Williams filed an application for unemployment compensation with the Employment Security Administration of the Maryland Department of Human Resources. Her application was denied based on a finding that she was fired for misconduct. Williams also filed an unsuccessful complaint with the Equal Employment Opportunity Commission ("EEOC"). Upon receiving her right-to-sue letter, she filed this action.

Initially, Williams alleged both race and sex discrimination in her employment and termination under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*), 42 U.S.C. § 1981, and 42 U.S.C. § 1983. She also claimed that she had been unlawfully discharged in retaliation for filing the discrimination charge with MCHR. After extensive discovery, the trial court dismissed Williams' § 1983 claim, her claims of sex discrimination, and her related claim that she was discriminated against in not receiving timely promotions.

In this posture, the case proceeded to a concurrent jury trial on the § 1981 claims and bench trial on the Title VII claims. After a three and one-half day trial, the jury returned a verdict in Williams' favor, awarding her $15,000 in back pay and $35,000 in compensatory damages. The trial court took Williams' Title VII claims under advisement.

Cerberonics immediately filed a motion for j.n.o.v., or, in the alternative, for a new trial. On February 10, 1988, the trial court found for Cerberonics on the Title VII claims and entered j.n.o.v. in its favor on the § 1981 claims. In the alternative, the district court granted Cerberonics' motion for a new trial. This appeal followed.

## II.

Appellant's contentions are easily stated. She maintains that the trial court erred in finding for Cerberonics on her Title VII claims and that it erred in entering j.n.o.v. on her § 1981 claims. She argues that the district court did not properly consider the evidence in reaching either conclusion.[1] We address the Title VII claims first.

Appellant made two claims under Title VII: that she was fired by Cerberonics because of her race, and that she was fired in retaliation for having filed a discrimination charge with MCHR. We turn our attention to the discrimination claim.

### A. *Discrimination*

For a plaintiff to prevail on a discrimination claim, she must first establish a four-part prima facie case:

(1) that she is a member of a protected class;

(2) that she was qualified for her job and her job performance was satisfactory;

(3) that, in spite of her qualifications and performance, she was fired; and

(4) that the position remained open to similarly qualified applicants after her dismissal.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973); *Holmes v. Bevilacqua*, 794 F.2d 142, 146 (4th Cir.1986) (en banc); *Smith v. Univ. of N.C.*, 632 F.2d 316, 332 (4th Cir.1980). Once this prima facie case is established, an inference of discrimina-

---

1. Appellant also contends that the trial court improperly excluded her general statistical evidence of Cerberonics' employment of minorities. The proffered evidence showed the percentage of qualified blacks in the greater Washington area relative to the percentage employed by Cerberonics. Appellant sought to introduce this evidence without expert testimony as to how the statistics were compiled or how they related to appellant's claim. Under these circumstances, we do not believe that the trial court erred in excluding this evidence under Fed.R.Evid. 403. Without expert testimony, the limited probative value of the evidence was plainly outweighed by the possibility it might mislead or confuse the jury. *See Foster v. Tandy Corp.*, 828 F.2d 1052, 1057 (4th Cir.1987) ("raw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value"). After issuance of this opinion, it was brought to our attention by West Publishing Co. that *Foster* was mistakenly published in full when it should have been designated a table decision without a published opinion. *Foster v. Tandy Corp.*, 848 F.2d 184 (4th Cir.1987). We have chosen not to amend this opinion but advise that proper reference to *Foster* should point to the table decision.

tion arises that may be rebutted by an employer on a showing of legitimate, nondiscriminatory reasons for the dismissal. *Smith, supra* at 332–33. Once this showing is made, the burden of proof lies with the plaintiff to show, by a preponderance of the evidence, that the employer's proffered reasons for the dismissal are pretextual. *Id.* at 333.[2]

In applying this analysis to appellant's case, the trial court found that she had established a prima facie case. The court also found that Cerberonics had met its burden of production in showing legitimate, nondiscriminatory reasons for appellant's discharge, namely: her insubordinate attitude, her difficulty in working with fellow employees, her tardiness in reporting for work, and her abuse of the telephone. Thus, the outcome of appellant's claim turned on the trial court's determination of whether Cerberonics' articulated reasons for dismissal were pretextual.

■ We pause to note that inherent in this determination are myriad findings of fact. Thus, we will not upset the trial court's finding as to pretext unless our reading of the record leaves us convinced that the trial court's decision was clearly erroneous. *Bevilacqua, supra,* at 147. On this record, we cannot conclude that the trial court clearly erred in holding that appellant was fired for legitimate reasons.

The evidence of appellant's misconduct on the job was overwhelming. As the trial court noted, testimony from Neuman, Hay, and Ludes concerning appellant's deteriorating job performance was consistent, fully corroborated by contemporaneously written memoranda, and entirely credible. Further, the record shows that the pace of the deterioration of appellant's job performance quickened after she was placed on probation. Her tardiness increased, she was confrontational with coworkers, and her misuse of the telephone continued unabated.

This substantial record of misconduct lies in stark contrast to appellant's slight evidence of discrimination. As the trial court noted, appellant's evidence of discriminatory intent was directed solely at Neuman and was composed almost entirely of her own assertions. She claimed that Neuman disciplined her more harshly for her tardiness and use of the telephone than he did other white employees. She also testified that she had overheard him making disparaging remarks about black males, a charge Neuman denied. Appellant also introduced the testimony of Seaman Troy Miller, who testified that when he was trained at the Lexington Park office, Neuman told him that Neuman did not want that "black uppity female" (appellant) in the Program. However, as the district court pointed out, all of this evidence was conclusively rebutted at trial.

As to appellant's claims of disparate treatment, Cerberonics introduced documented evidence that her tardiness was much worse than that of her fellow employees and that another white employee had been terminated for abuse of the telephone. Seaman Miller's testimony concerning Neuman's racial animus was negated when it was shown by Neuman's passport that at the time the alleged remark about appellant was made, Neuman was in the Indian Ocean at a training session. Thus, appellant's evidence of discrimination boils down to her own assertions concerning her poor relationship with Neuman. As we have previously held, a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action. *Gairola v. Commonwealth of Virginia Dept. of General Services,* 753 F.2d 1281, 1288 (4th Cir. 1985). What appellant's assertions did prove was that she and Neuman did not like each other. As another court has said:

> [t]his personality conflict generated antipathy and professional incompatibility

**2.** The ultimate burden of persuasion in a Title VII or § 1981 employment discrimination case never "shifts" from the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207

(1981). The shifting intermediate evidentiary burdens established by *McDonnell Douglas, supra,* and its progeny, merely expedite the process of plaintiff's proof. *Id.*

which might have made it more difficult for the plaintiff to perform. But this certainly does not translate into discrimination. An employer is not required to like his employees. *Bradington v. Int'l Business Machines Corp.*, 360 F.Supp. 845, 854 (D.Md.1973), aff'd 492 F.2d 1240 (4th Cir.1974). Such is the case here. This record, if anything, proves personal animus on the part of Neuman, not racial animus. It proves nothing at all about Williams' other supervisors. The evidence in this case manifestly supports the district court's conclusion that appellant was not terminated on the basis of her race and, therefore, we affirm this holding.

### B. *Retaliatory Discharge*

To prevail on her retaliatory discharge claim, appellant had to follow the same sequence of proof that she was required to follow in her discrimination claim. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). In this instance, however, her prima facie case consisted of three parts:

(1) that she engaged in protected activity;

(2) that Cerberonics took adverse employment action against her; and

(3) that a causal connection existed between the protected activity and the adverse action. *Id.*

Once this prima facie case is established, it must be rebutted by legitimate nonretaliatory reasons for the adverse action. *Id.* Again, after the employer meets the prima facie case, the burden of proof lies with the plaintiff to establish by preponderance of the evidence that the proffered reasons are pretextual. *Id.*

The trial court concluded that there had been no retaliation because appellant had failed to make her prima facie case. The court opined that she had failed to show a causal connection between her termination and the protected activity.[3] On this point, we cannot agree.

It is undisputed that appellant engaged in protected activity when she filed her discrimination charge. Likewise, no one contests that she was fired. Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality. However, despite the fact that appellant has made her prima facie case, we hold that she has not proven retaliatory discharge.

As discussed above, Cerberonics has articulated and proven legitimate nondiscriminatory and nonretaliatory reasons for appellant's termination. Other than the fact that at the time she was fired her supervisors were aware that she had filed a discrimination claim, appellant has produced no other evidence of retaliation. Plainly, mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee. Again, a trial court's determination on the legitimacy of an employer's motives for taking an adverse employment action is essentially one of fact that we will not overturn unless clearly in error. The record in this case overwhelmingly supports the trial court's finding of no retaliation, and consequently, although on different reasoning, we must affirm.

### III.

Because appellant did not produce any direct evidence of discriminatory or retaliatory intent on the part of Cerberonics, she was forced to prove her § 1981 discrimination and retaliatory discharge claims circumstantially, through the identical ele-

---

**3.** This conclusion was based in part on the trial court's erroneous belief that appellant's supervisors had no knowledge of her discrimination charge until after she was terminated. It is clear from the record that both Hay and Ludes were aware that she had filed a charge at the time Ludes decided to terminate her.

ments and shifting intermediate evidentiary burdens employed in her Title VII claims. *Gairola, supra*, at 1285–86. However, the jury viewed appellant's evidence more favorably than did the trial court and returned a verdict in her favor. As we have just concluded, there was substantial evidence in this record to support the court's verdict in favor of Cerberonics. That, however, does not end our inquiry. Plainly, there frequently may be sufficient evidence in a record to support a verdict for either party. That is reason in the first instance for having a trial.[4] Our task is to review this trial court's decision that on this record the evidence cannot reasonably support a verdict in appellant's favor. That we now do.

A trial court may not appropriately enter j.n.o.v. unless it concludes, after consideration of the record as a whole in the light most favorable to the non-movant, that the evidence presented supports only one reasonable verdict, in favor of the moving party. *Foster, supra*, at 1055.[5] The special difficulties and concerns in making this determination in the employment discrimination area, where subtleties of motive and intent abound, were cogently discussed at length in our holding in *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230 (4th Cir. 1982).

There, we noted that in the discrimination area the danger of improvidently sending a case to the jury is amplified by the inherent difficulties in conclusively proving matters of motive and intent. *Id.* at 242. This is so even in cases where the plaintiff has made a prima facie case that has been rebutted by the employer. *Id.* at 243–45. At that point, absent the benefit of the presumption of unlawful intent, plaintiff's circumstantial evidence of discrimination is equally open to the inference that the employer's actions were not discriminatory. *Id.* at 244. Thus, such a case does not automatically present a jury question. Accordingly, we held that j.n.o.v. is appropriate whenever the evidence as a whole does not support the inference that it was reasonably probable that discriminatory intent was the "but for" cause of the adverse employment action. *Id.* at 243. The rationale underlying this standard is persuasive.

To guard against the danger that the jury will reach a decision on the basis of mere speculation, in light of the demonstrated difficulty in choosing rationally between "mere possibility" and "substantial probability", by impermissible but understandable resort to such factors as sympathy, the *Lovelace* court held that "the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon the claimants and subjected to the ultimate jury control devices of directed verdict and judgment n.o.v."

*Foster, supra*, at 1056 (quoting *Lovelace, supra*, at 242). We find this reasoning equally applicable to appellant's retaliatory discharge claim. We also find that under

---

**4.** Appellant strenuously argues that once the jury returned a verdict in her favor on the § 1981 claims, a verdict that necessarily encompassed all of the material questions of fact in her Title VII claims, the trial court should have conformed its findings of fact accordingly. The facts in this case do not allow us to agree. As a general proposition, we stated in *Swentek v. USAIR Inc.*, 830 F.2d 552, 559 (4th Cir.1987), that trial judges are encouraged to conform their equitable findings to jury verdicts on the same essential facts. And, we are aware of the growing body of authority that says a trial court is bound in Title VII cases to conform its findings of fact to those of the jury in concurrently tried § 1981 cases. *See Roebuck v. Drexel University*, 852 F.2d 715, 737–39 (3rd Cir.1988). However, we need not address this issue because, as we stated in *Swentek, supra*, this principle is stretched to the breaking point if the trial court would be forced to accept an infirm

verdict. Since we conclude that there was not sufficient evidence for the jury to base a verdict in appellant's favor, we find no error in the trial court making its findings of fact contrary to those of the jury. Although deference must be paid to the jury's role as the finder of fact, it is always incumbent upon a trial court to follow its view of the clear weight of the evidence.

**5.** It is axiomatic that in making this determination, the court cannot weigh the credibility of the witnesses. Appellant's claim to the contrary notwithstanding, a reading of the entirety of the lower court's opinion demonstrates that the court did not impermissibly weigh credibility in reaching its conclusion to grant j.n.o.v. Rather, the court was doing nothing more than articulating, in a detailed fashion, that the evidence supported no other reasonable verdict.

this analysis the trial court correctly entered j.n.o.v. against appellant on both her claims.

▮ Appellant's only evidence of discriminatory intent was her own assertions concerning Neuman. She presented no evidence of racial animus on the part of Hay or Ludes, the officials responsible for her discharge. Further, the corroborating testimony of Neuman's animus by Seaman Miller must be discounted because of its documented impossibility. As the Fifth Circuit has noted:

> [W]e have recognized that generalized testimony by an employee regarding his subjective belief that his discharge was the result of age discrimination is insufficient to make an issue for the jury in the face of proof showing an adequate, non-discriminatory reason for his discharge.

*Elliott v. Group Medical & Surgical Service,* 714 F.2d 556 (5th Cir.1983) *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984) (citation omitted). This reasoning rings especially true when appellant's proof is posed against the voluminous documentation of her misconduct and the internally consistent testimony of her supervisors. We agree with the trial court that no reasonable inference can be drawn that discrimination was the probable "but for" cause of appellant's discharge.

Appellant's charge of retaliatory discharge is similarly untenable. Aside from the fact that at the time she was fired her superiors had knowledge that she had filed a discrimination charge, she presented no evidence to support her claim other than her own assertions. Set against the documented deterioration of her work after she was placed on probation and her continued abuse of telephone privileges after repeated warnings, no reasonable trier of fact could conclude that retaliation figured in her dismissal. As the trial court noted, this jury may have been impermissibly swayed by appellant's emotional testimony, a danger that we have repeatedly recog-

nized. *See Foster, supra,* at 1056; *Lovelace, supra,* at 242. We agree with the district court that the evidence in this record cannot reasonably support the inference that the probable "but for" motive behind appellant's discharge was retaliation. This conclusion is strongly supported by the Maryland Employment Security Administration's conclusion that appellant was fired for misconduct. *See Ross, supra,* at 363 (such proceedings while not having preclusive effect are relevant and worthy of consideration). Thus, we affirm the entry of j.n.o.v. in favor of Cerberonics.[6]

### IV.

In sum, because the trial court was not clearly erroneous in rendering a verdict in favor of Cerberonics on the Title VII claims, and because j.n.o.v. was appropriate on the § 1981 claims, we affirm the judgment below in all respects.[7]

AFFIRMED.

PHILLIPS, Circuit Judge, dissenting:

Because the jury reasonably could have concluded that Karen Williams received discriminatory treatment by her employer, Cerberonics, Inc., on account of her race, I would reverse the district court's grant of a judgment notwithstanding the verdict on Williams' § 1981 claims for disparate treatment and retaliatory discharge. I therefore respectfully dissent from the majority's holding to the contrary. I would affirm, however, the district court's alternative grant of the motion for a new trial on these claims. In order to avoid its preclusive effect in the new trial, and preserve Williams' right to jury trial on her § 1981 claim, I would vacate the district court's bench trial judgment in favor of Cerberonics on Williams' Title VII claim pending return of a jury verdict on the remanded § 1981 claim to which the Title VII judgment should then be conformed.

---

6. Because we conclude that j.n.o.v. was appropriate, there is no need to address the trial court's alternative grant of a new trial.

7. Cerberonics cross-appeals and complains that the trial court should have entered summary judgment in its favor on Williams' retaliatory discharge claims. Our disposition of the case makes it unnecessary to address this claim.

## I

The standards by which courts should assess the sufficiency of evidence on a motion for directed verdict or jnov in a jury trial on a discrimination claim were discussed in *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230 (4th Cir.1982). *Lovelace* was an age discrimination (ADEA) case, but the standards applied there are appropriate to Williams' claims of racial discrimination since an ADEA proof scheme is itself transposed from a disparate treatment proof scheme under Title VII. *Id.* at 238. Williams' legal claims were brought under § 1981, whose elements of proof are the same as a Title VII claim. *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1058 (4th Cir.1984).

The majority and I are in agreement that the burden of production has been satisfied in the first two of the three steps required under the presumption-centered proof scheme enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980). Maj. op. at 455–56. There is no quarrel that Williams carried her initial burden of production by establishing a prima facie case of discrimination and that Cerberonics carried its burden of production at the second stage by introducing sufficient evidence that it treated Williams disfavorably for legitimate, nondiscriminatory reasons. The point of dispute, then, is at the third stage of the proof scheme: whether Williams showed that Cerberonics' stated reasons for its treatment and dismissal of her were pretextual. Maj. op. at 456. I therefore limit my discussion of the trial court's obligation in reviewing a motion for directed verdict or jnov to that stage of the analysis. Here Williams' burden of production

> relates again to the motivational issue but now as recast by the defendant's proffered explanation into the more specific form whether as between the plaintiff's [race] and the defendant's proffered reason, [race] is the "more likely." In assessing whether this recast burden of production has been carried, the court

may properly consider plaintiff's evidence offered to establish the dispelled [prima facie] presumption along with any designed to show defendant's proffered explanation to be a pretextual one. If the burden if carried, the case is for the jury under proper instructions defining the motivational issue as ultimately framed at the "new level of specificity" created by the defendant's rebutting evidence. If this ultimate burden is not carried the defendant's motion should of course be granted, even though the plaintiff's original burden of production was carried by force of the presumption.

*Lovelace*, 681 F.2d at 241 (citations omitted).

We have emphasized that in addressing the question of whether the evidence on the ultimate motivational causation issue is sufficient, the court must be concerned that any verdict for the plaintiff be based on substantial probability rather than mere possibility. *Id.* at 242. The emphasis on probability emerges from the concern

> that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate jury control devices of directed verdict and judgment n.o.v.

*Id.*

Under this framework I analyze separately Williams' § 1981 claims of disparate treatment and retaliatory discharge.

## II

At the stage of inquiry we are considering, Williams' burden of production is recast into the question whether the evidence would support a jury finding that her race rather than Cerberonics' alleged reasons were the more likely grounds for her treat-

ment and dismissal. I believe that Williams did carry her burden here and that consequently her case was properly before the jury. Specifically, under the *Lovelace* standard, the evidence was sufficient for the jury to find, on the basis of reasonable probability, that Williams had been discriminated against because of her race. I therefore would reverse the jnov granted by the district court on Williams' discrimination claim.

Cerberonics relies upon evidence suggesting that Williams' discharge was caused, and justified, both by poor job performance and job misconduct. On the first Cerberonics cites in particular the results of recent class questionnaires where Williams was an instructor. J.App. 613 (Dec. 12, 1982, probation notice). Williams, on the other hand, maintains that the evidence would support a finding that the assertion of poor job performance was pretextual. She introduced evidence that on each salary review prior to 1982 she received at least a 10% increase in salary, which indicated, according to Cerberonics' own standards, excellent or outstanding performance. J.App. 476–48 (salary reviews of January 1980, February 1981, and October 1981); 468 (company standards on salary increases). In October 1981, for example, Williams was given a "special salary review in recognition of [her] professional competence in accomplishment of assigned tasks." J.App. 478. She also produced evidence that the quality of her job performance was unchanged throughout 1982, introducing results of numerous class questionnaires, J.App. 535–84, and telexes from various job locations expressing appreciation for her work. J.App. 585–87 (telexes from August 1982, October 1982, and January 1983). Even Mr. Neuman, the supervisor with whom she had the greatest difficulty, testified that Williams' job performance and attitude did not change between her October 1981 job review and the review undertaken in the fall of 1982. J.App. 298.

Cerberonics' second alleged reason for Williams' termination is her job misconduct. Here Cerberonics points to evidence of Williams' inability to work harmoniously with co-workers or others, her tardiness, and her excessive use of an office telephone for personal calls. As example of Williams' uncooperative behavior, the company—and the majority, *see* slip op. at 5—mentions a 1980 hotel incident in Japan, where Williams refused to pay for damages caused when, while asleep, she accidently kicked a pillow on top of a space heater, the pillow caught fire, and it burned a hole in the rug. The burn created a hole the size of a quarter, and the hotel wanted $400 in damages to replace the rug in its entirety. J.App. 96(c). While Neuman's report indicates that the matter would have been resolved easily and quickly had Williams attempted to resolve the problem amicably, J.App. at 640, the contemporaneous memorandum by her co-employee, Michael Goddard, who was also staying at the hotel, suggests that Williams went to considerable lengths to conclude the matter responsibly. When Williams said she would not pay for the rug because of such a small burn, hotel management called the police. Williams then telephoned the ship on which she was due to give instructions to tell superiors that she would be delayed. She was advised to call shore patrol, which she did. The police wanted Williams to talk with the owner of the hotel about a settlement, and Williams agreed to delay her departure in order to wait for an appointment with the owner at six that evening. On her return to the hotel for the appointment, accompanied by Goddard, she was told that the owner could not return until ten. She and Goddard could not wait but went to the police station to confer. The police informed them that charges were pending but allowed them to leave. J.App. 641 (Goddard memorandum). The matter was later settled, and Williams agreed to pay some money to the hotel. J.App. 99. Williams' colleagues treated the incident as one of little consequence, *Id.*, and it was not cited whatsoever in later job evaluations, for which she received, as already mentioned, salary increases commensurate with excellent job performance. J.App. 477–78.

Cerberonics' second major example of Williams' uncooperative behavior, also cited

by the majority, at 454, is her argument with Neuman over the use of a reserved parking space while on a San Diego job site in September 1982. Williams received written permission to park in the space, J.App. 175, and when Neuman continued to press her on the use of the space, she moved the car. J.App. 111(a). The majority states that Neuman ordered Williams to return to the home office because of the incident, at 454, but Wayne Hay, department manager and Neuman's supervisor, testified that Neuman's response was so extreme that Neuman in fact told Williams she was fired. J.App. 340. The majority also neglects to note that Hay countermanded Neuman's order and told Williams to remain in San Diego to finish the job. *Id.*

Cerberonics also contends that it was justified in terminating Williams for job misconduct because of her tardiness and her excessive use of the phone for personal use. These were cited in particular as examples of the deterioration in Williams' conduct after she was put on probation. Williams testified, on the other hand, that because ABO personnel traveled so much and worked so hard in the field, the office environment was lax; punctuality in the office was not an issue as long as staff members completed their work. J.App. 115–16. Neuman acknowledged that other employees were also tardy. J.App. 286. As for phone use, co-employee Theodore Newkirk testified that it was the practice of all employees to use the phone for personal calls and that he saw other employees so use both their desk phone and the phone in the conference room. J.App. 68, 70. It is true that one other employee was terminated because of excessive use of the phone, but this employee charged to the company over $800 in long-distance calls. J.App. 77.

The phone call that Williams received in the conference room on February 18, 1983, which led to her suspension and subsequent termination, was from her attorney. Williams had filed a discrimination complaint against Cerberonics in November 1982, and on February 18 had tried to call her attorney about recent events while she was at home for lunch. The attorney was not in at the time, and he returned the call to Williams that afternoon when she was back at work. So that she did not have to receive the call at her desk, which is in an open area where the call would be overheard, Williams took the call in the conference room. Understandably, she did not want to identify the caller to Hay, who found her in the room, so she hung up the phone and went back to her desk. J.App. 128–29. After a meeting was convened at which Hay, Neuman, and John Ludes, division manager, were present, Williams stated, according to Hay, that the call was from her attorney and concerned company business. J.App. 373. Williams was suspended immediately and terminated shortly thereafter. J.App. 130–31. I return to this incident in discussion of Williams' retaliatory discharge claim, but for the moment it is sufficient to note that Williams' use of the conference phone here was not only understandable under the circumstances but typical of employee phone use in general.

In response to all of Cerberonics' claims of her poor job performance and misconduct, then, Williams contends that the evidence shows that her performance and conduct were at worst unexceptional and that the incidents mentioned were pretextual reasons for the discriminatory treatment she received. As additional indications that her behavior was discriminatorily singled out by management, Williams cites three other pieces of evidence. First, Neuman never gave her, unlike everyone else, compensatory time—time off as payment for periods where she worked overtime in the field. J.App. 117. Second, Lorraine Clark, a white woman who was hired in April 1982, J.App. 448, was given preferential assignment to a number of job locations that Williams requested but was refused. J.App. 86. On at least two other occasions, Neuman decided to send Clark and not Williams to a job assignment, and Williams was able to go also only on the intervention of someone higher than Neuman in the organization. J.App. 86, 108. By October 1982, Clark was also receiving higher pay than Williams for the same job. J.App.

449, 667. Third, Theodore Newkirk, a black male hired in the fall of 1982, reported that Neuman's behavior toward Williams was arrogant and nasty, a continued pattern that Neuman displayed toward no other employee. J.App. 66–68. Despite this treatment, Newkirk testified, Williams' response to Neuman was always respectful: "The way Mr. Neuman would express himself towards Karen and the way Karen reacted was—I just don't see how anyone could be that nice." J.App. 66.

Obviously, the evidence on the question of pretext—whether Williams was fired for discriminatory reasons or for the non-discriminatory reasons assigned—was in stark conflict. Either inference was certainly a permissible one for the jury. It might have inferred that Williams had come over time to be such a thorn in the side of the enterprise, so disruptive of personal relations, so unproductive, that this rather than anything connected to her race, was the reason for her discharge. But there was evidence supporting the opposite inference—that the non-discriminatory reasons specifically assigned were, upon inspection, sufficiently flimsy to indicate that they were indeed pretextual, not the real reason. I am satisfied that under our precedents the evidence was more than sufficient to support the jury verdict in Williams' favor.

Accordingly, I would reverse the district court's grant of judgment n.o.v. on Williams' disparate treatment claim.

## III

I would also reverse the trial court's jnov on Williams' claim of retaliatory discharge. I agree with the majority, slip op. at 457, that Williams satisfied the elements of a prima facie case and that the crux here is whether the evidence, considered in its most favorable light, was sufficient to negate Cerberonics' nondiscriminatory explanation for her discharge and thereby to permit the inference that it would not have occurred "but for" her filing a discrimination claim with the Maryland Commission on Human Relations. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365–66 (4th Cir.1985). As with Williams'

discrimination charge, I believe that Williams carried her burden of production and that the jury verdict in her favor is therefore supported.

Williams filed her discrimination complaint with the Maryland Commission on Human Relations on November 4, 1982. J.App. 601–11. Ludes, Hay, and Neuman, the three management employees in attendance at the meeting at which Williams was suspended on February 18, 1983, all testified that they knew of Williams' discrimination charge by the date of this meeting. J.App. 311, 313 (Neuman); 363–64 (Hay); 384–85 (Ludes). This sequence of events, Williams' unrebutted evidence that her phone use was typical of that of other Cerberonics employees, and the evidence that she was suspended and then terminated because of a phone call with her lawyer completely support, though surely it did not compel, the jury verdict that her discharge was retaliatory. I would therefore reverse the trial court's grant of Cerberonics' motion for jnov as to that claim.

## IV

Because I would reverse the district court's grants of jnov, I then must address its grant in the alternative of a new trial, an issue the majority of course did not have to reach. That ruling is a discretionary one which we review under a highly deferential abuse of discretion standard. *Wadsworth v. Clindon*, 846 F.2d 265, 266 (4th Cir. 1988); *Gill v. Rollins Protective Services Co.*, 836 F.2d 194, 196 (4th Cir.1987). Applying that standard, I would affirm the alternative grant of a new trial.

## V

Because I would affirm the grant of a new trial, I must also address the problem—not faced by the majority—of the effect upon that retrial of the district judge's findings and judgment against Williams on her parallel Title VII claim. To allow that judgment to have preclusive effect would of course effectively nullify the new trial, because the adverse findings in the Title VII claim would clearly forestall plaintiff's

attempt to prove her identical § 1981 legal claims of discriminatory and retaliatory discharge. This in turn raises the fundamental issue of whether to allow such a preclusive result would violate Williams' jury trial rights in pursuing her § 1981 claims on retrial.

In confronting this jury trial issue, we encounter some problems in squaring our recent precedents with controlling decisions of the Supreme Court. The basic precept controlling the proper handling of joined legal and equitable claims raising common issues of fact in the same action remains that announced in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959): the right to jury trial of the legal claim must not be lost through prior determination of the equitable claim except "under the most imperative circumstances." *Id.* at 510–11, 79 S.Ct. at 957. Accordingly, to protect the jury trial right, trial of such joined claims, where possible, must be arranged and staged to insure primacy and preclusive effect for jury findings on the common issues. *Id.*

This does not mean that equitable findings embodied in a final judgment in one action may not have the ordinary issue preclusive effect of a prior judgment on the resolution of the same issues in a later legal action; they may. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). But most courts, perhaps all but this court, have not applied the *Parklane* jury preclusion rule to circumstances involving joined claims in the same action. Rather, when confronted with that circumstance, other courts uniformly have followed the basic precept of *Beacon Theatres* to insure binding jury resolution of the common issues. *See, e.g., Bouchet v. National Urban League, Inc.*, 730 F.2d 799, 803–04 (D.C.Cir.1984) (Scalia, J.); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir.1988); *Roebuck v. Drexel University*, 852 F.2d 715, 738 (3d Cir.1988); *Ward v. Texas Employment Comm'n*, 823 F.2d 907, 908–09 (5th Cir. 1987); *In re Lewis*, 845 F.2d 624, 629 (6th Cir.1988); *Volk v. Coler*, 845 F.2d 1422, 1437 (7th Cir.1988); *Garza v. City of Omaha*, 814 F.2d 553, 557 (8th Cir.1987); *GTE Sylvania, Inc. v. Continental TV, Inc.*, 537 F.2d 980, 986 n. 7 (9th Cir.1976); *Dybczak v. Tuskegee Institute*, 737 F.2d 1524, 1527 (11th Cir.1984). Importantly, a number of these courts have applied this basic precept where, as here, the joined legal and equitable claims have been employment discrimination claims under § 1981 and Title VII, respectively.* *See Wade*, 844 F.2d at 954; *Roebuck*, 852 F.2d at 738; *Ward*, 823 F.2d at 907–08; *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1293–94 (7th Cir.1987); *Lincoln v. Bd. of Regents*, 697 F.2d 928, 934 (11th Cir.1983).

Although this court has recognized the *Beacon Theatres* precept as basically controlling in the joined claim context, *see Swentek v. USAIR, Inc.*, 830 F.2d 552, 559 (4th Cir.1987); *Gnossos Music v. Mitken, Inc.*, 653 F.2d 117, 119–20 (4th Cir.1981); *Tights, Inc. v. Stanley*, 441 F.2d 336, 337

---

* It has been argued—though in a different context—that because claimants under the various federal anti-discrimination statutes might be positively disfavored by jury trials given the potential for racial prejudice on juries, non-jury trials of such claims should be preferred. *See, e.g., Curtis v. Loether*, 415 U.S. 189, 191–92, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974) (argument advanced in support of contention that Congress did not intend to provide jury trials on Title VIII damages actions). Transposed to the context of joined legal and equitable race-discrimination claims under § 1981 and Title VII, the argument would presumably be that in that context, the basic *Beacon Theatres* precept should be reversed, with primacy and preclusive effect being accorded the Title VII bench trial findings—that this is just such an "imperative circumstance" warranting primacy for non-jury findings on common issues as *Beacon Theatres* posited. There are several answers to this possible argument. (1) The Supreme Court in *Curtis v. Loether* rejected the notion that non-jury trials could or should on that account be the preferred mode of trial of such claims, both on constitutional, 415 U.S. at 192, 94 S.Ct. at 1007, and practical, 415 U.S. at 198, 94 S.Ct. at 1010, grounds. (2) No other court of appeals has adopted it as a general rule for handling joined legal and equitable claims of race discrimination. (3) The race-discrimination claimant ordinarily retains the power to make her own judgment about the balance of risks—including that of racial prejudice—as between the two modes of trial.

(4th Cir.1971), we have recently held it not applicable where, following erroneous dismissal of ADEA and Equal Pay Act legal claims, the district court found against claimant on a joined, parallel Title VII equitable claim. In that situation, we held that the *Parklane* preclusion rule would apply and that because it would defeat any remanded trial of the erroneously dismissed legal claims, that dismissal and the consequent loss of jury trial right was harmless error. *Ritter v. Mount St. Mary's College,* 814 F.2d 986, 990–91 (4th Cir.1987); *accord Dwyer v. Smith,* 867 F.2d 184 (4th Cir.1989).

We may stand alone at this point in holding *Parklane*'s preclusion rule applicable in the joined claim situation, *see Roebuck,* 852 F.2d at 737 (so asserting), but *Ritter* nevertheless stands as controlling precedent for that rule in this circuit. However, I think the situation created by ordering a new trial here is sufficiently different from that presented in *Ritter* that *Ritter*'s rule does not control here. Here, unlike the situation in *Ritter,* both claims have proceeded to resolution: by jury verdict favorable to claimant on the § 1981 claims, and by judge findings against claimant on the parallel Title VII claim. In that circumstance, I think we are free to follow the *Beacon Theatres* precept, and indeed must. *See Roebuck,* 852 F.2d at 738–39 (so distinguishing *Ritter* from comparable situation there presented); *see also Swentek* 830 F.2d at 562–63 (where parallel Title VII and state tort claims joined, adverse Title VII findings should not be preclusive of state tort claim remanded for legal error after verdict for claimant; *Ritter* distinguished).

To follow the *Beacon Theatres* precept here would require that we vacate that portion of the judgment denying Williams' Title VII claim, and remand that claim with directions to hold it in abeyance pending jury verdict on the remanded § 1981 claims and thereupon to enter judgment on the Title VII claim conformed to the jury verdict. *Accord Roebuck,* 852 F.2d at 739; *Volk,* 845 F.2d at 1438 (reversing the Title VII judgment); *Bouchet,* 730 F.2d at 803 (Scalia, J.) (if jury trial required, Title VII judgment should be vacated). Only in this way can Williams' rights to a jury trial under § 1981 be preserved.

I would so order.