73 F.3d 358
NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Thomas S. STOVER, Plaintiff-Appellant,
v.
LINCOLN PUBLISHING, INC. (North Carolina), a Delaware
Corporation, dba The Enquirer-Journal, Defendant-Appellee.
 No. 95-1832.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 2, 1995.
Decided Dec. 28, 1995.
 
 ARGUED: Jenny Lu Sharpe, SHARPE & FOSBINDER, P.A., Charlotte, North Carolina, for Appellant. Steven D. Starnes, KOY E. DAWKINS, P.A., Monroe, North Carolina, for Appellee.
 Before MURNAGHAN, MICHAEL and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Thomas S. Stover filed this action against his former employer, Lincoln Publishing, Inc., asserting that he was unlawfully terminated from his job as a part-time mail room employee. Specifically, Stover alleged that his employer had fired him in retaliation for his participation in activities protected by Title VII of the Civil Rights Act of 1964, and in violation of state public policy prohibiting retaliation against employees who exercise their rights under the State Workers' Compensation Act. After extensive discovery, the magistrate judge granted summary judgment to the employer. Finding no reversible error, we affirm.
 
 
 2
 On December 12, 1991, Stover began working for The Enquirer-Journal, a wholly owned subsidiary of Lincoln. On March 12, 1992, Stover was promoted to the position of mail room foreman. Two months later on May 22, 1992, Stover injured his knee while at work and filed a workers' compensation claim. Stover did not come into work for the next six weeks. Reviewing his performance as foreman, The Enquirer determined that Stover was not "mechanically inclined" and did not have the necessary "supervisory skills." Therefore, on July 8, 1992, The Enquirer replaced Stover as foreman but told him that, if he wished, he could return to work as a part-time mail room employee. Stover eventually did return to work in this capacity on July 20, 1992 and worked for eight days in July. On July 27, 1992, Stover filed a complaint with the EEOC, contending that he had been demoted because of his age (40) and race (white). (Stover had been replaced by a 54 year-old white male). Stover worked for six days in August. On August 18, 1992, The Enquirer fired Stover, assertedly because he was bothering and harassing female co-workers. Stover filed a timely notice of discrimination with the EEOC. The EEOC ultimately dismissed Stover's allegations, concluding that there was "no witness testimony or record evidence which refute[d] the legitimate non-discriminatory reason given [by The Enquirer] for [Stover's] discharge." After the EEOC issued a right to sue letter, Stover filed this action.
 
 
 3
 To prevail on a Title VII retaliatory discharge claim, an employee must establish direct evidence of discrimination or a prima facie case, which includes (1) evidence that the employee engaged in a protected activity, (2) evidence that the employer took adverse action against him and (3) evidence of a causal connection between the protected activity and the adverse action. See Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985). The employer is then required to produce evidence of a legitimate, non-discriminatory reason for the employee's termination. Id. At all times, however, the ultimate burden of proving the employer intentionally discriminated rests on the employee. St. Mary's Honor Ctr. v. Hicks, --- U.S. ----, 113 S.Ct. 2742, 2747 (1993).
 
 
 4
 The magistrate judge concluded that Stover had not established a prima facie case because he had not provided evidence of a causal connection between the EEOC complaint and his discharge. Additionally, the magistrate judge ruled that even if Stover had provided sufficient evidence, the employer's legitimate, non-discriminatory, reasons for firing Stover dispelled any presumption of retaliation a prima facie case could provide. Accordingly, the magistrate judge concluded that Stover had failed to satisfy his "ultimate burden of showing that he was discriminated against by the defendant."
 
 
 5
 Stover's first claim is that the Ross test, formulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is inapplicable here because he provided direct evidence of retaliation. See Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir.1995). The Enquirer justified Stover's firing in a letter to the North Carolina Employment Security Commission, which stated that Stover had been fired because he "was in the process of filing an EEOC charge against The Enquirer-Journal and was making it impossible for his co-workers to work with him due to his harassment of them trying to get them to join in his campaign of complaints and charges against The Enquirer-Journal." The magistrate judge held that this letter was not the "smoking gun" that Stover perceived. Read in context, the magistrate judge concluded, the letter merely stated that the reason The Enquirer fired Stover was for his repeated practice of bothering and distracting his co-workers, and that it just happened that he was bothering them about his EEOC complaint. Id.
 
 
 6
 This Court has defined "direct evidence" as evidence that the employer "announced, admitted, or otherwise unmistakably indicated that [the forbidden consideration] was a determining factor...." Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir.1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), cert. denied, 454 U.S. 860 (1981)). Stated differently, direct evidence is "evidence of conduct or statements that reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir.1995). We agree with the magistrate judge that The Enquirer's letter, viewed in context, does not constitute direct evidence of retaliation. The letter did not reflect a discriminatory attitude on The Enquirer's part towards Stover's filing of his EEOC claim or indicate that the filing of the claim led to his discharge. Instead, the letter unmistakably indicates that it was Stover's harassment of his co-workers, to the point that he was making it impossible for them to work, that led to his discharge.[1]
 
 
 7
 Stover next contends that the magistrate judge erred in concluding that he had not established a causal connection between the EEOC complaint and his discharge. Stover asserts that the magistrate judge erroneously ignored the short period of time between the two events and focused only on The Enquirer's letter. We agree that the magistrate judge erred in concluding that Stover had not established the requisite causal connection. Cf. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989) (fact that employee was fired approximately four months after filing a discrimination complaint "satisfies the ... burden of making a prima facie case of causality"). Accordingly, the magistrate judge erred in ignoring the short duration of time involved in this case (twenty-one days) and should have concluded that Stover had established a prima facie case.
 
 
 8
 The magistrate judge's error regarding Stover's establishment of a prima facie case does not require reversal if the undisputed material facts support the magistrate judge's further conclusion that The Enquirer's explanation for discharging Stover adequately rebutted any presumption of discrimination. The magistrate judge summarized the evidence as clearly reflecting that:
 
 
 9
 [T]he plaintiff had difficulty handling his responsibilities as mail room supervisor. As a consequence, the defendant replaced the plaintiff as supervisor of the mailroom while plaintiff was on leave. Upon the plaintiff's return to work, he was offered a non-managerial, part-time position, which he initially refused but later accepted. While employed in his new position, the plaintiff began harassing his co-workers for information and support in connection with his claim against the defendant. After receiving a complaint from at least one of the plaintiff's co-workers, the defendant concluded there was no place in its company for the plaintiff. Accordingly, the plaintiff was terminated.
 
 
 10
 Stover does not claim that the magistrate judge misstated the evidence as to the basis for his demotion. He only asserts that there are material factual disputes as to whether he "harass[ed]" his co-workers and as to whether the complaint from "at least one" co-worker was The Enquirer's real reason for firing him.
 
 
 11
 The Enquirer offered undisputed evidence that it had terminated Stover because at least one employee complained that Stover (1) stared at her in such a way as to make her feel "apprehensive" by what she perceived as "a sexually threatening attitude and atmosphere arising from his actions" and (2) harassed her in an attempt to get her to join in his "campaign of complaints and charges" against Lincoln. Specifically, in response to Stover's EEOC charges, The Enquirer's personnel director, Patricia Deese, stated that Stover was terminated on August 18, 1992 because "fellow employees were complaining to management that he was harassing them and trying to get them to join him in his campaign of complaints and charges against The Enquirer-Journal."
 
 
 12
 Deese most heavily relied on the complaints of another part-time mailroom employee, Dorothy Lee. Deese's contemporaneous notes of her August 18 conversation with Dorothy Lee were consistent with her response to the EEOC:
 
 
 13
 [Stover] called Dot while she was on sick leave. Wanted her to call him at home, that she would want in on what he had going. She never did call him. Just that he had something going against the paper.
 
 
 14
 Talking about people being hired to replace people on sick leave. They could have done the same for him. It was discrimination.
 
 
 15
 She has been approached 3-4 times. Also, he has wanted her to give him her home number. He wanted to get in touch with her son. Also he wanted to talk with Sonny Walker and Mark Walker, neither of whom works here anymore.
 
 
 16
 ...
 
 
 17
 Dot was told that he took the other people's time cards and made copies of them so he could see how many hours of time they had.
 
 
 18
 Watching Dot like "he's a sex maniac."
 
 
 19
 Lee's five-page handwritten affidavit, dated September 2, 1993, prepared at the request of the EEOC, is similarly consistent with the above accounts--albeit in somewhat greater detail.
 
 
 20
 In asserting that there are factual disputes as to this evidence, Stover does not point to evidence of his denial of this conduct. This is surprising because the parties engaged in extensive pretrial discovery of all kinds--interrogatories, requests for documents, requests for admissions, and depositions--and so the particulars of these complaints were well known to Stover. Yet, neither in his deposition nor in any affidavit or pleading did Stover deny that he had engaged in the complained about conduct. Even in this court, Stover does not argue that he did not stare at, bother, or harass Lee or his other co-workers. Instead, he directs his attention to attempting to demonstrate that his co-workers were so obviously unworthy of credence that The Enquirer's asserted reliance on them was pretextual.
 
 
 21
 With regard to the principal complainant, Dorothy Lee, Stover argues that four factors support his argument that her charges were not credible and that The Enquirer knew, or should have known, not to believe her. First, Stover finds it significant that Lee "had been asked to report" on Stover's inquiries after "The Enquirer's receipt of his charge of discrimination." Although this account of the timing is correct, the record simply does not offer any support of Stover's inference that the newspaper was seeking an "opportunity" to discharge him. Rather, all of the evidence is to the contrary. For example, Lee's account is that she initiated the discussions with management about Stover because she was annoyed that he was "constantly bothering" her. When she complained about Stover, her supervisor, Paul Mauney, did not take any immediate action. Rather, he simply told Lee "to let him know" if Stover confronted her in the future. When Lee complained again, Mauney told her she could either "take no action" or go to the personnel director; Lee expressly swore that Mauney "did not encourage" her to go to the personnel director. Rather, Lee stated that she herself "made the decision to go to Ms. Deese and complain about Mr. Stover."
 
 
 22
 Stover's second basis for asserting Lee was not credible was that although she had complained to management that Stover "watched" her like a "sex maniac," she later conceded in deposition that he had never made any sexually offensive remarks or gestures or attempted to touch her in a sexual manner. How this undermines Lee's credibility is unclear. All that she complained about were Stover's stares--his "watching" of her. In her deposition she reaffirmed her dislike and fear of those stares; indeed, the detail of her deposition testimony significantly corroborated, rather than undermined, the sincerity of her complaints. For example, she testified that not just in the few days before he was fired, but for many months, Stover had been staring at her breasts. She stated that she had not reported it sooner because she knew that Stover was related to an acting supervisor and she "wanted to keep her job."
 
 
 23
 In a similar vein, Stover finds evidence of Lee's lack of credibility in the fact that, although The Enquirer's counsel had asserted that Lee was so afraid of Stover that she might leave the state if required to testify, in her deposition Lee denied that Stover had ever threatened her. Stover accurately recounts portions of Lee's deposition but examination of the whole of her testimony simply does not lead to the inferences Stover suggests. Rather, while conceding that Stover had never threatened her, Lee insisted from the outset of her deposition that she was afraid of Stover and was concerned for her safety. Indeed, she confirmed that she was so afraid of Stover that she might try to leave the state to avoid testifying in the case; she did not want to be deposed; and, when nonetheless ordered to be deposed, she refused to furnish her address to Stover's counsel during the deposition.
 
 
 24
 Stover's final basis for claiming Lee lacked credibility and that The Enquirer should have known this is, on its face, compelling. Stover points both to Lee's acknowledgement in her deposition that when Stover was foreman, he had fired Lee's husband for reporting to work drunk, and to personnel director Deese's statement in her testimony that she was aware of the circumstances surrounding Mr. Lee's termination. The problem with this argument from Stover's point of view is that Lee's uncontradicted testimony, in response to questions from Stover's counsel, was that she was not upset when Stover fired her husband because they were separated and not living together and, in fact, two years later at the time of the deposition were still separated and not living together. Lee further stated that her husband was not obligated to pay her any child support or alimony. Thus, there would not seem to be any reason why her estranged husband's firing would bias Lee against Stover. Indeed, Lee did not believe that there was anything at all wrong with firing her estranged husband, remarking that anybody acting "on the job like that would be terminated."
 
 
 25
 We have exhaustively examined the record in this case not to determine whether Lee was credible but to determine whether Stover has created a sufficient factual dispute regarding the genuineness of The Enquirer's purported explanation for discharging him. We find that Stover's allegations concerning Lee's credibility were insufficient to support the necessary inferences that Lee's complaints about Stover were incredible (particularly when Stover has not directly denied that the conduct Lee complained about occurred), that The Enquirer knew or should have known that Lee's complaints were incredible, and therefore The Enquirer's reliance on Lee's complaints was pretextual. The Enquirer consistently asserted that it fired Stover because of the complaints of female employees,[2] and that Lee was the principal complainant. Shortly after Stover's termination, Lee filed a handwritten detailed affidavit with the EEOC outlining her complaints. Although frightened of Stover and no longer an employee of The Enquirer, Lee confirmed these complaints at her deposition in response to extensive questioning by Stover's counsel. Stover, who certainly had an opportunity to do so, never denied that he had engaged in the complained of conduct. That conduct may not have constituted sexual harassment, although Lee testified that she believed it did, but it surely provided a valid basis for The Enquirer to fire Stover. Accordingly, the magistrate judge did not err in granting summary judgment to The Enquirer; Stover has not created a sufficient factual dispute regarding The Enquirer's legitimate, non-discriminatory basis for firing him. See Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir.1993) (summary judgment appropriate when the employer "provides a legitimate non-discriminatory explanation about which the plaintiff does not create a factual dispute").
 
 
 26
 Finally, Stover's state law claim can be dealt with summarily. North Carolina General Statute Sec. 97-6.1, in effect at the time of Stover's discharge but subsequently repealed, prohibited employers from discharging employees for filing workers' compensation claims. Stover could not make a claim under the statute because he failed to file suit within the statute's one year limitations period. Nevertheless, looking to the repealed statute as evidence of North Carolina public policy, Stover contends that he was wrongfully discharged in violation of that policy. The magistrate judge dismissed this claim, citing the North Carolina Court of Appeals decision in Bridgers v. Whiteville Apparel Corp., 323 S.E.2d 50, 52 (N.C.App.1984), for the proposition that "North Carolina does not recognize a claim for relief apart from G.S. 97-6.1 for a discharge in retaliation for filing a workers' compensation claim."
 
 
 27
 Stover asserts that Amos v. Oakdale Knitting Co., 416 S.E.2d 166 (N.C.1992), undermines the holding in Bridgers. In Amos, workers had been fired for refusing to work for less than the minimum wage.
 
 
 28
 The lower courts ruled that the plaintiffs had no claim for wrongful discharge because the minimum wage laws provided them with their only remedy--a suit for back pay. The North Carolina Supreme Court reversed, holding that the minimum wage law remedy did not preclude a viable claim for wrongful discharge in violation of public policy if the state legislature did not intend to supplant the common law with exclusive statutory remedies. Amos, 416 S.E.2d at 167. Amos does not help Stover. Unlike the minimum wage statutes at issue in Amos, Sec. 97-6.1 created a direct remedy for wrongful discharge in a certain circumstance, i.e., when in retaliation for filing a workers' compensation claim. This clearly evidences a legislative intent to provide an exclusive statutory remedy for such a claim.[3] Stover's attempt to find North Carolina's public policy embedded in Sec. 97-6.1, yet to avoid the statute of limitation contained in Sec. 97-6.1 by claiming that a public policy wrongful discharge claim somehow extends the limitations period beyond that contained in the statute is therefore without merit.
 
 
 29
 Stover's appeal regarding punitive damages is moot. The magistrate judge's decision is
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Stover contends that Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), established that there need only be a "nexus" between the challenged statement and the employer's decisional process, citing EEOC v. Alton Packaging Corp., 901 F.2d 920 (11th Cir.1990), in support. However, Alton explicitly states that "Price Waterhouse does not define direct evidence." Id. at 924
 
 
 [2]
 We note that there is evidence that two other female employees also complained--albeit to a lesser extent--about Stover's conduct and staring. Again, Stover does not deny their charges. Rather, he claims those charges were insignificant or played no role in The Enquirer's decision to fire him. There is no need to undertake similar exhaustive examination of those charges and Stover's arguments, in view of the fact that Lee's series of complaints in themselves provided a sufficient legitimate, nondiscriminatory basis for The Enquirer to fire Stover
 
 
 [3]
 Similarly, Stover's argument, based on the reasoning in Amos, that Sec. 97-6.1 could not have been intended to supplant common law remedies because it was enacted before the North Carolina appellate courts recognized exceptions to the employment at will doctrine, fails because of the very different nature of the statute here