56 F.3d 61
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Lurenda FEATHERSTONE, Plaintiff-Appellant,
v.
UNITED PARCEL SERVICES, INCORPORATED, Defendant-Appellee.
 No. 94-2331.
 United States Court of Appeals, Fourth Circuit.
 Submitted April 25, 1995.
Decided May 23, 1995.
 
 Charlene Adelle Wilson, Baltimore, MD, for appellant. Peter Francis Healey, Jr., Fulbright & Jaworski, L.L.P., Washington, DC, for appellee.
 Before ERVIN, Chief Judge, and LUTTIG and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Lurenda Featherstone, an African-American Jehovah's Witness, appeals the district court's order granting summary judgment to his employer, United Parcel Service, Inc. ("UPS"), in his Title VII action alleging racial and religious discrimination, and retaliation. 42 U.S.C.A. Secs. 2000e-2(a), 2000e-3(a), 2000e-5 (West 1994). We previously granted the parties' motion to submit this appeal on the briefs, and we now affirm.
 
 
 2
 Featherstone began working for UPS in 1978 as a part-time package handler and obtained his present job as a full-time package car driver in 1987. Featherstone's complaint centers around a series of disciplinary actions taken against him by his supervisors from 1990 to 1993 in response to his inefficiency and repeated violations of company procedures. Featherstone asserted that he was singled out for harassment by management because of his race and religion, that his work was scrutinized to an unbearable degree, and that company policies were applied and enforced more stringently against him than against his co-workers. Moreover, Featherstone alleged that UPS management intensified their discriminatory practices after he filed grievances pursuant to a collective bargaining agreement.
 
 
 3
 UPS denied discriminating against Featherstone and outlined instances of Featherstone's inefficiency and failure to follow company policies which led to the disciplinary actions. Prior to suspending and discharging Featherstone, UPS issued numerous warnings to him for failing to follow supervisory instructions. These letters reported that Featherstone repeatedly:
 
 
 4
 (1) failed to deliver and pickup all packages on his route;
 
 
 5
 (2) failed to report missed pickups and deliveries;
 
 
 6
 (3) failed to follow UPS's procedures for COD transactions;
 
 
 7
 (4) failed to call his dispatcher to notify UPS that he would be returning late to the center;
 
 
 8
 (5) failed to fill out his time card, misload card, delivery sheets, and control logs properly;
 
 
 9
 (6) was involved in avoidable traffic accidents;
 
 
 10
 (7) performed inefficiently when left unsupervised; and
 
 
 11
 (8) reacted negatively to supervision.
 
 
 12
 In addition to written warnings, UPS management conducted numerous on job supervision ("OJS") rides in order to "retrain" Featherstone. On the OJS rides, a supervisor would accompany Featherstone on his route, observe his performance, and prepare a written report listing his improper or inefficient procedures. Featherstone was expected to make the necessary corrections to his work and was held thereafter to a level of efficiency equal to his most efficient performance during any supervised ride. After the OJS rides, UPS conducted written interviews with Featherstone to reinforce the need to continue using standard procedure. Despite these retraining efforts, Featherstone failed to maintain acceptable job efficiency and continued to disobey his supervisor's instructions regarding standard procedures. A series of suspensions and terminations ensued.
 
 
 13
 UPS suspended Featherstone for one day for disobeying his supervisor's instructions and for allegedly telling his supervisor, "I don't care," when confronted about it. Featherstone maintained that his words were taken out of context and that his supervisor made false accusations in order to harass him. Featherstone appealed through a grievance, and a panel of UPS and union representatives upheld the suspension.
 
 
 14
 UPS suspended Featherstone for three days without pay for failing to follow his supervisor's instructions. Featherstone again acknowledged that he violated certain instructions but maintained that they were petty infractions and that management was scrutinizing his conduct to the point of harassment in order to find violations. In response to his suspension, Featherstone sent a letter to his union, asserting that his supervisor was biased against African-Americans and Jehovah's Witnesses. Featherstone also circulated a petition to his customers, asking them to sign it if they believed that he was a good worker.
 
 
 15
 Featherstone received his next suspension after two warning notices and an interview for failure to follow instructions, failure to deliver and pick up packages, failure to report his service failure to management, and failure to fill out his time card properly. A three-day suspension was imposed after Featherstone again missed a pickup, failed to report it to his supervisor, and incorrectly filled out his time card.
 
 
 16
 UPS terminated Featherstone's employment due to a customer complaint that Featherstone failed to pick up a parcel. Featherstone admitted that the missed pickup was his fault. However, he alleged that a white driver who had made the same mistake on the same day was called by a supervisor while he was still out on his route so he could pick up the missed package and avoid punishment.
 
 
 17
 After the intervention of Featherstone's union, his discharge was reduced to a thirteen-day suspension without pay. Featherstone's reinstatement was shortlived, however, and he was again discharged for failure to follow proper COD procedures, defacing UPS property, and for leaving a note to a customer on a UPS delivery notice which read, "you should learn to be nice then somebody would take your package."
 
 
 18
 Featherstone challenged the second discharge by filing a grievance. The union conceded that Featherstone had "made some poor decisions" and "honest mistakes." The grievance committee reduced the discharge to a forty-one-day suspension without pay.
 
 
 19
 Featherstone was again discharged after warnings for failure to follow supervisory instructions and making derogatory remarks to customers about UPS. Featherstone grieved his discharge through his union. In its brief filed on behalf of Featherstone, the union argued on his behalf that UPS had originally promoted Featherstone to full-time driver without regard to his qualifications and then punished him for being unqualified. The grievance committee reduced Featherstone's termination to a forty-nine day suspension without pay.
 
 
 20
 Featherstone originally filed an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). He then filed his retaliation claim with the EEOC. The EEOC issued Featherstone a right to sue letter and this lawsuit ensued.
 
 
 21
 This Court reviews de novo a district court's grant of summary judgment and affirms only if the record reveals no genuine issue of material fact. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 63 U.S.L.W. 3257 (U.S.1994). A genuine issue of material fact exists when, viewed in the light most favorable to the nonmovant, the evidence presents a sufficient disagreement to require submission to a jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986). At summary judgment, all issues of credibility are resolved in the nonmovant's favor. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990), cert. denied, 498 U.S. 1109 (1991). A party moving for summary judgment must show the lack of evidence to support his opponent's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). However, the nonmovant then bears the burden of demonstrating the presence of a contested issue of fact. The nonmovant must point to specific evidence establishing a triable dispute, and cannot rely upon bare allegations. Anderson, 477 U.S. at 248; Fed.R.Civ.P. 56.
 
 I. Discrimination
 
 22
 In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973), the Supreme Court established the familiar "order and allocation of proof" for Title VII cases in which the plaintiff alleges disparate treatment. First, the plaintiff must establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. Once a prima facie case is presented, the defendant must "articulate some legitimate nondiscriminatory reason for the" disparate treatment. Id. The articulated nondiscriminatory explanation is "presumptively valid," and the plaintiff must demonstrate that the explanation is pretextual and "meet the ultimate burden of proving intentional discrimination" by a preponderance of the evidence. Moore v. City of Charlotte, 754 F.2d 1100, 1106 (4th Cir.), cert. denied, 472 U.S. 1021 (1985). The burden of proof never shifts from the plaintiff in a Title VII case. St. Mary's Honor Ctr. v. Hicks, 61 U.S.L.W. 4782, 4784 (U.S.1993).
 
 A. Discipline
 
 23
 Featherstone maintains that he has established a prima facie case of discriminatory disciplinary action by UPS. He asserts that he presented evidence sufficient to create a genuine issue as to whether he was disciplined more strictly than similarly situated white and non-Jehovah's Witness UPS employees. An employee can show unlawful discrimination under Title VII if he was disciplined more severely than another employee who had committed a similar infraction. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282 (1976). A plaintiff must show: (1) that he is within a protected class; (2) that he "engaged in prohibited conduct similar to that of a person" outside of his protected class; and (3) that he received "more severe" discipline than was received by the other employee. Moore, 754 F.2d at 1105-06.
 
 
 24
 To determine whether a comparison between employees is valid, we examine whether the defendant had as much cause to discipline the non-minority employee as it had to discipline the plaintiff. Moore, 754 F.2d at 1107. Instead of insisting on identical infractions for purposes of comparison, the inquiry assesses the gravity of the offenses in order to find acts against the employer of comparable seriousness. Id. Where the record discloses no sufficiently analogous offenders, no inference of discriminatory animus can be drawn from the "uniqueness" of a plaintiff's punishment. Id. at 1109-10.
 
 
 25
 Featherstone identifies three examples of disparate treatment by Defendant in disciplining its drivers. First, he cites the warnings he received for two avoidable traffic accidents, alleging that a white employee received the same disciplinary action for his involvement in a more serious accident. Taking Featherstone's allegation as true, it does not demonstrate disparate treatment. Both drivers received a written warning, even though Featherstone was involved in two accidents. There is no evidence that UPS ever adjusted the type of discipline it imposed according to the severity of the avoidable accident in which a driver was involved.
 
 
 26
 Second, Featherstone alleges that he was singled out for punishment for not taking his lunch between the fourth and sixth hours of his work day, as required by UPS regulation. He identified several white drivers who were not punished despite continuously eating lunch late in the day. UPS presented sworn statements explaining that it applies its lunch rule to all drivers. According to UPS, this rule is enforced on all OJS rides. In addition, supervisors will verbally warn a driver about the policy if they learn that the driver is disregarding the rule, and will then expect compliance during future OJS rides.
 
 
 27
 UPS freely admitted that some drivers may violate the rule without discipline, "particularly if their supervisors are unaware of the violations," because the drivers "complete their routes in a timely fashion and avoid frequent close supervision." Defendant thus impliedly admits that some drivers escape discipline for violating the lunch hour rule, even though their supervisors are aware of the violation. Based upon Featherstone's sworn testimony identifying specific white drivers who violated the lunch rule and UPS's admission, Featherstone successfully established a prima facie case of disparate treatment on this issue.
 
 
 28
 We find, however, Featherstone failed to establish that Defendant's articulated reason for the disparate treatment was a pretext for unlawful discrimination. Featherstone did not allege or demonstrate that any of the white drivers failed to complete their routes on time or were otherwise found inefficient such that rigorous enforcement of the lunch hour rule would be necessary. By contrast, Featherstone's admitted numerous infractions made close supervision necessary. Moreover, Featherstone did not cite one instance in which a white or non-Jehovah's Witness driver violated the rule during an OJS ride and avoided reprimand. Finally, Featherstone neither alleged nor proved that UPS exempted white or non-Jehovah's Witness employees from the lunch hour rule entirely.
 
 
 29
 In his third allegation of disparate disciplinary treatment, Featherstone identified a white driver who forgot to pick up a package on the same day that Featherstone forgot a package. According to Feather stone, the white driver was notified of the package while still on his route and was therefore able to pick up the package and avoid punishment. By contrast, Featherstone was notified of his error only after he returned to UPS center at the end of his day. He was discharged because of this incident.
 
 
 30
 UPS did not deny Featherstone's sworn statement but responded that Featherstone did not establish whether the prior disciplinary record of the other driver was in any way comparable to his own. UPS noted that Featherstone had a number of infractions in his record. Defendant's argument does not invalidate Featherstone's prima facie case of disparate treatment but instead provides an explanation for that disparate treatment.[1] Therefore, Featherstone established a prima facie case of discrimination on this issue. See Moore, 754 F.2d at 1105-06.
 
 
 31
 We find, however, that UPS's explanation constituted a legitimate nondiscriminatory reason for the disparate treatment, which Featherstone failed to discredit. Featherstone's suspension for the missed package was the culmination of his well-documented history of infractions which led to a gradual increase in the sternness of the disciplinary responses by UPS. Even if the white driver's mistake were identical to Featherstone's, there is no evidence that he had previously committed a single violation of UPS policy. Moreover, there is no evidence that Featherstone was reprimanded in any way for his first such mistake. Because he failed to place in context his comparator's isolated violation, Featherstone did not create a genuine issue as to whether UPS's rationale for failing to punish the white driver was pretextual.
 
 
 32
 As additional evidence of pretext, Featherstone avers that statistical evidence demonstrates that UPS disciplines its African-American drivers more often than its white drivers. However, his assertion is conclusory and therefore inadequate to survive summary judgment. Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir.1989). Plaintiff's counsel simply submitted the personnel files of thirty-two drivers and UPS's Weekly Operations Reports to the district court, without preparing any sort of statistical analysis on the raw data contained therein. This proffer is inadequate.
 
 B. Terms and Conditions of Employment
 
 33
 Featherstone also claims that he and other African-American drivers are assigned longer routes with more pick-ups and deliveries than are white drivers. However, Defendant established through sworn affidavits and documented UPS procedures that routes are given to drivers according to a bid system based upon seniority. Seniority systems are afforded special treatment under Title VII. Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 904 (1989); 42 U.S.C. Sec. 2000e-2(h) (1988). Because Featherstone offers no evidence suggesting that the UPS seniority system is not bona fide, his claim on this issue lacks merit, even assuming the bid system has an adverse impact on African-American employees. Lorance, 490 U.S. at 905.
 
 C. Harassment
 
 34
 Featherstone asserts on appeal that he has established a triable claim of discriminatory harassment or hostile work environment, alleging that he was subjected to verbal epithets and derogatory references to his religion and discrimination in work assignments and management. To establish a hostile environment claim, Featherstone must show:
 
 
 35
 (1) that he was subjected to harassment based upon his race and/or religion;
 
 
 36
 (2) that the harassment was "sufficiently severe or pervasive to alter the conditions of [a reasonable person's] employment and create an abusive working environment";
 
 
 37
 (3) that he subjectively perceived the harassment; and
 
 
 38
 (4) that UPS knew or should have known of the harassment.
 
 
 39
 White v. Federal Express Corp., 939 F.2d 157, 160 (4th Cir.1991).
 
 
 40
 Featherstone's chief evidence that he was harassed based upon his race or religion is his supervisor's statement that "it's not right for Jehovah's Witnesses to be knocking on peoples door[sic]." Featherstone also points to notes taken by UPS Employee Relations Manager Charles Maker, which document severe unrest among the drivers attributable to demeaning treatment they received from management. However, this evidence demonstrates that harassment by management was provided without regard to race or religion.[2] Although Featherstone and a white driver were identified by other drivers as particularly subject to mistreatment, eighteen drivers signed a petition to Maker expressing their displeasure with the treatment they received. Featherstone may have established that UPS supervisors were mean-spirited and treated their drivers poorly, but not that they were discriminatory in doing so. See Goldberg v. B. Green & Co., 836 F.2d 845, 849 (4th Cir.1988). We find that Featherstone failed to establish discriminatory harassment or a hostile work environment. To the extent that Featherstone was singled out by management, it was because of his unacceptable job performance.
 
 D. Other Assignments of Error
 
 41
 Featherstone charges that the district court improperly required him to produce direct evidence of discrimination and awarded summary judgment based upon his failure to do so. His assertion is unsupported by the court's opinion. The district court found that Featherstone failed to "articulate specific evidence to support his allegation[s]" and instead relied upon "his own assertions" and "conclusory allegations" which were inadequate to create a genuine issue of fact. We agree.
 
 
 42
 Featherstone also faults the district court for making credibility determinations against him. He contends that absent these inappropriate credibility determinations, there would exist genuine issues of material fact for trial. Featherstone avers that the district court found incredible statements of his co-workers that charged management with unfair harassment of Featherstone. In fact, the district court made proper evidentiary rulings, not improper determinations of credibility. The statements at issue were inadmissible, unsworn hearsay. Fed.R.Evid. 802; Fed.R.Civ.P. 56. Moreover, to the extent that these statements purport to assign legal conclusions to factual occurrences, they represent the conclusory opinions of Featherstone's co-workers. Credibility aside, a lay witness's legal opinions are simply irrelevant. Finally, other evidence disclosed that the minority drivers interviewed believed that management's conduct was not driven by racial animus.
 
 
 43
 Featherstone also complains that the district court discounted his sworn testimony in favor of the testimony of UPS witnesses. Specifically, Featherstone notes that he denied (1) disobeying instructions and violating company procedures; (2) telling his supervisor "I don't care," in response to a question; (3) defacing company property; (4) being "rude" to a customer; and (5) making derogatory remarks about UPS to his customers. He asserts that he created a genuine issue of fact as to the validity of UPS's stated reasons for its disciplinary actions.
 
 
 44
 Again, Featherstone misapprehends the nature of credibility, insisting that his disagreement with Defendant's choice of words creates an issue of fact which should survive summary judgment. In his sworn statements, Featherstone admits the behavior described by UPS. While Featherstone may take issue with such adjectives as "rude" and "derogatory" used by Defendant, such disagreement does not create an issue of fact as to whether UPS disciplined Featherstone because of his behavior. Because Featherstone confesses to the conduct charged, the district judge's findings did not depend upon a credibility determination.
 
 II. Retaliation
 
 45
 Featherstone maintains that he established a genuine issue as to whether UPS retaliated against him for filing an EEOC complaint on December 26, 1991. For each claim based upon incidents occurring after December 26, 1991, Featherstone alleges that if UPS did not discriminate against him because of his race or religion, it took the challenged actions in retaliation for his EEOC complaints in violation of 42 U.S.C. Sec. 2000e-3(a) (1988).
 
 
 46
 Featherstone also presented one additional claim under the rubric of retaliation. He contended that after filing his complaint with the EEOC, Defendant assigned him to the Murphy Homes route, a known high crime area. UPS denied that its decision was retaliatory. Undisputed evidence established that the Murphy Homes route was assigned to many drivers as an "add-on route" to fill out a projected 8.5 hour work day. The route was also on Featherstone's way back to the UPS Center. In addition, when Featherstone returned from a suspension, he successfully bid on a new route and has not been reassigned to Murphy Homes since that time.
 
 
 47
 We find that Featherstone established a prima facie case of retaliation by showing (1) that he engaged in protected activity; (2) that Defendant took adverse employment action against him; and (3) that a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985). He satisfied the third element of the prima facie case by showing that UPS acted with knowledge of his EEO filing. Williams, 871 F.2d at 457.
 
 
 48
 However, once Defendant articulated a legitimate nondiscriminatory reason for its actions, Featherstone had to offer evidence showing that "the adverse action would not have occurred'but for' the protected conduct." Ross, 759 F.2d at 366. This Court has "reject[ed] the view that Title VII has been violated if retaliation for protected activity was merely 'in part' a reason for the adverse action." Id. "Unsupported allegations as to motive do not confer talismanic immunity from [summary judgment]." Id.; Williams, 871 F.2d at 459. Moreover, an employer's mere knowledge that an employee has filed a discrimination charge is insufficient to counter substantial evidence of legitimate reasons for the action. Williams, 871 F.2d at 457.
 
 
 49
 Featherstone has offered no evidence to contradict Burke's explanation of the Murphy Homes assignment. As for his other claims of retaliation, Featherstone asserts that the same evidence he presented to demonstrate a genuine issue of fact regarding his discrimination complaint establishes that the reasons articulated by UPS for their conduct are pretextual. As in the context of his discrimination claims, Featherstone has offered no evidence rebutting Defendant's nondiscriminatory reasons for its disciplinary actions and supervision. Therefore, we find that his claim of retaliation lacks merit.
 
 
 50
 We affirm the district court's award of summary judgment to Defendant. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 AFFIRMED
 
 
 [1]
 Arguably, UPS is attempting to show that, in light of Featherstone's prior misconduct, the two infractions were not similar and that UPS did not have as much cause to discipline the white driver as it had to discipline Featherstone. Moore, 754 F.2d at 1107. However, a proper reading of Moore and McDonald focuses the prima facie case inquiry on the specific offense at issue
 
 
 [2]
 Maker's notes from a meeting with one group of drivers read as follows: "This was a dominant minority group this morning that stated they didn't think it was a racial issue, but was more favoritism toward certain drivers as well as an outright desire to humiliate others." Maker stated in a sworn affidavit that he found no evidence suggesting that Featherstone was discriminated against because of his race