**LAWYERS TITLE INSURANCE CO., Plaintiff,**

v.

**GOLF LINKS DEVELOPMENT CORP., Defendant.**

**and**

**Mid–Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund, a Trust, Intervenor/Plaintiff.**

**No. CIV. 2:97CV268.**

United States District Court, W.D. North Carolina, Bryson City Division.

Sept. 17, 1999.

Michelle Rippon, Asheville, NC, for Plaintiff.

David G. Boggs and Garth K. Dunklin, Charlotte, NC, for Defendant.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment and motions *in limine* on the issues of parol evidence and attorney-client privilege. Defendant also filed a motion to bar testimony from a potential witness.[1] For the reasons stated herein, summary judgment is granted for the Plaintiff and Intervenor Plaintiff (collectively, Plaintiffs) and Defendant's motion for summary judgment is denied. The motions are addressed herein.

### I. PROCEDURAL BACKGROUND

Defendant removed this action from state court based on diversity jurisdiction. The only issue for resolution is whether there was a mutual mistake of fact war-

---

1. Defendant moved to bar testimony from Gary Doyens based on unauthorized contact with him by Plaintiffs' counsel. The Court finds the motion, unsupported by any citation to case law, meritless.

ranting reformation of the insurance policy issued by the Plaintiffs.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Defendant. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Plaintiffs as the moving parties have an initial burden to show a lack of evidence to support the Defendant's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Defendant who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Defendant]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Defendant, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The same procedure will be applied in reviewing the Defendant's motion for summary judgment.

## III. STATEMENT OF FACTS

The facts are essentially undisputed. In 1984, H.L. Tomlinson and his wife, Grace, (Tomlinsons) purchased a 1.47 acre lot in Macon County on which they built a home. Exhibit 1, Affidavit of Susan Taylor Rash, *attached to* Plaintiffs' Motion for Summary Judgment, filed September 10, 1999. This particular lot (Lot 28) was originally part of a larger parcel owned by Holly Springs Golf and Country Club (Holly Springs) which sold it to the Tomlinsons. *See* Exhibits 4 and 5 *attached to* Rash Affidavit.

Holly Springs fell on hard times and entered into bankruptcy in April 1986. Exhibit 8 *attached to* Rash Affidavit. As a result, the bankruptcy trustee was allowed to foreclose against the property and it was sold in October 1988 to the highest bidder, The Welfare and Pension Fund of the Mid–Jersey Trucking Industry Local 701 (Teamsters), for $1 million. *Id.* The trustee's deed contained an exception for Lot 28:

> THERE IS EXCEPTED FROM the lands above described the following portions thereof which have heretofore been released from the lien of the Deed of Trust as follows:
>
> > Lot No. 28 of the Holly Springs Golf and Country Club ...... Subdivision as shown by the plat thereof recorded in Plat Cabinet 1, Slide 177, at page 6 to which plat as so recorded reference is hereby had.

*Id.* This exception specifically related to the Tomlinsons' property and the deed was made of record.

In January 1996, Golf Links Development Corporation (Golf Links) offered to buy Holly Springs from the Teamsters for the sum of $850,000. Exhibit 3, Offer to Purchase and Contract *attached to* Complaint. Golf Links was to make a $100,000 down payment and the Teamsters held a promissory note for $750,000. *Id.* Contained in the offer was the following:

> Seller [Teamsters] represents that *to the best of its knowledge* that the real property in Exhibit A, is comprised of an 18 hole golf course, nine of which are developed, 5 cottages, the Patillo farm house, the club house, the maintenance shed, several platted lots in the subdivision and three unimproved parcels of raw land. Any other contiguous property owned by the Seller in Macon County, North Carolina shall also be included in this sale, it being the intent of seller to convey title to all of its property on or about the property more particularly de-

scribed above. *If this representation proves to be materially untrue, Buyer's sole remedy will be to declare the contract terminated and receive a refund of the earnest money.* *Id.* (Emphasis added). This provision of the offer obligated Golf Links as the buyer to ascertain the exact dimensions of the property being conveyed. However, in accordance with contractual provisions requiring the seller to provide evidence of title (paragraph 28 of the Offer), the Teamster's attorney attached as Exhibit A to the contract an eight page property description which erroneously included Lot 28. Rash Affidavit. Under the terms of the contract, Golf Links had until January 31, 1996, to ascertain whether the Teamsters owned the property in Exhibit A. Exhibit 3, *attached to* Complaint, *supra;* Exhibit 5, Affidavit of Anthony Sidoti, *attached to* Plaintiffs' Motion. Golf Links did not exercise this option and made no claims prior to the March 1996 closing that the representation was untrue. *Id.* However, Exhibit A with its inaccurate description of Lot 28 was ultimately included in the deed.

Gary Doyens was the president and chief executive officer of Golf Links. Affidavit of Gary Doyens, *attached to* Plaintiff's Brief in Response to Defendant's Motion to Strike or, alternatively, Motion to Dismiss, filed October 15, 1997. He was involved in the negotiations for the purchase of the property. *Id.* Originally, he was acting as an entrepreneur and took potential investors with him on several trips to view the property. Exhibit 2, Deposition of Gary Doyens, *attached to* Plaintiffs' Motion, at 6–8. During one of those trips, he actually walked the property with a Teamsters' representative while looking at maps obtained from the tax assessor's office. *Id.*, at 9. There was never any representation that the offer would include a lot with a completely constructed home. *Id.*, 10. "It was never represented by the Teamsters to include a completed house on a landscaped lot." *Id.* Doyens' original investors backed out and he contacted an old friend for advice as to any new investors. *Id.*, 19–20. That friend suggested he contact Thomas Trexler who dealt in a type of financing known as small corporate offering registration (SCOR). *Id.*, at 28; Exhibit 15, Deposition of Thomas Trexler, *attached to* Plaintiffs' Motion, at 7. Doyens did so and Trexler participated in revisions to the draft offer presented by the Teamster's attorneys. Doyens Deposition, at 43–44. Ultimately, Doyens and Trexler formed Golf Links to purchase the property. After the contract was finalized, Doyens took another trip to Holly Springs to inventory the property. *Id.*, at 54. "[S]o we looked at lots in the subdivision and kind of walked that whole property. We walked all over the raw land, all along the creek bed.... We inventoried all of that stuff and basically walked that entire property." *Id.*, at 54–55. However, a fully developed lot with a house on it was not part of the land inspected or inventoried. *Id.*, at 56. Lot 28 was "never part of the due diligence." *Id.*, at 78. "It was never part of our business plan. It was never part of our financials. It was never part of our appraisal." *Id.* "There was never any discussion or contemplation that the conveyance would include Lot 28, ... in the description of the property to be conveyed and this was a mistake." Doyens Affidavit, *supra*, at ¶'s 3, 4. After the closing, a prospectus was prepared because Golf Links was going make a public offering of stock. *Id.;* Doyens Deposition, at 84. The prospectus did not contain any mention of or reference to Lot 28. *Id.*, 87–89. About six months after the closing, Doyens left Golf Links because he did not approve of the manner in which income generated by stock sales was being spent. *Id.*, at 97–98.

Thomas Trexler was the majority stockholder of Golf Links and he signed the contract offering to purchase Holly Springs. He testified that he did not know all of the property to be acquired in connection with the contract; he "absolutely" did not know what Golf Links was actually buying. Trexler Deposition, at 5–7. He did not know the complete extent of the

property or the total number of buildings and improvements included in the contract. *Id.*, at 9. In the process of deciding whether the golf course should be purchased, Trexler was provided an appraisal by Doyens but he did not review it. *Id.*, at 98, 101. He only looked at the pictures of the golf course and the "bottom line" or appraised value. *Id.*, at 104. Trexler had a "general sense" that a local golf course of this nature was worth about $1 million. *Id.*, at 99. "A key factor in purchasing this property was its ability to be used as a vehicle to sell stock by an affinity group." *Id.*, at 108. "Essentially ... my plan was to own this property with no debt" by using investors' money. *Id.*, at 118. By selling stock in Golf Links, the money necessary to finance and improve the property would be raised. *Id.* In return, the investors would own equity in a golf course. *Id.*, at 124. Prior to the purchase, Trexler visited the property once and spent only about an hour there. *Id.*, at 130. During this visit, he made no inspections of any buildings or improvements. *Id.*, at 132. He did not read the legal description contained in Exhibit A attached to the contract and he did not know what was included in that description. *Id.*, at 146, 166. He also did not know that Exhibit A contained a mistake. *Id.*, at 205. Trexler testified that he could not recall when he first asserted ownership of Lot 28. *Id.*, at 218. He could not recall having a plan for the use of Lot 28 when the property was purchased or at any time after the purchase. *Id.*, at 222–23. Trexler did not recall whether he told anyone he would sell Lot 28 in order to raise money for the project. *Id.*, at 229. At the time of the deposition in 1999, Golf Links was in bankruptcy.

Jon Rogers was one of the individuals who inspected Holly Springs prior to the purchase by Golf Links. He was offered the job of managing the golf course after the purchase. He made more than one trip, using a map which had been provided by the seller. At no point was he ever told, and the map did not disclose, that Lot 28 was included in the sale. Exhibit 3,

Deposition of Jon Rogers, *attached to* Plaintiffs' Motion, at 18–19. In July 1996, Trexler came for a visit and Rogers escorted him as he viewed the property. *Id.*, at 43–45. Trexler was not shown and did not ask about Lot 28. *Id.*, at 45–46. In 1997, Ernie Carlson, an investor in Golf Links, came to the golf course to ascertain why the property taxes were high. *Id.*, at 67. Rogers and Carlson matched the property description and map with the tax rolls and discovered duplicate Lots 28, one improved and one unimproved. *Id.*, at 67–68. Carlson reported to Trexler that one of the lots had a $265,000 home located thereon. *Id.* A couple of days later, Trexler called Rogers and said that Golf Links owned the lot with the constructed home. *Id.*, at 69. Rogers disputed this, saying that it had never been included in any inventory which he had done and it was simply a mistake in the deed. *Id.*, at 69–70. Trexler told Rogers:

> Yes, we own it. And we're going to sue, and we're going to get triple damages. We're going to get $750,000 and pay off the union, so it won't cost me any money.... This is free money. We can pay off the golf course, get rid of the union, and do what we want. This is like a blessing in disguise.... People make mistakes, and they pay for them.

*Id.*, at 70–71.

Orville Coward represented Golf Links in the purchase of the property. He testified that although he did a title examination prior to the closing, "it is apparent that I wasn't careful enough." Exhibit 4, Deposition of Orville Coward, *attached to* Plaintiffs' Motion, at 49. Based on Mr. Coward's review of public records, "Lot 28 was not owned by the Teamsters on March the 6th, 1996, it having been conveyed out of the chain of title quite a few years before that." *Id.*, at 46. In July 1997, Coward sent a letter to the attorney for Lawyers Title Insurance Corporation

> because Mark Pinkston sent me a letter that said that he was going to—that he as the attorney for Lawyers Title was

going to pay-or advise the payment of $240,000.00 to Golf Links under the title policy. And the title company was inquiring of me as the certifying attorney-in other words, as the attorney who had rendered his opinion on the title to the title insurance company-if they should forward that money or if they should investigate it further. And I sent this letter to indicate to them that they should investigate it further.

*Id.*, at 61. Indeed, in that letter Mr. Coward explicitly stated:

There was never any mention to me of an intention that the Teamsters would sell Golf Links a $240,000 house on Lot 28 .... The Teamsters included Lot 28 in the deed by mistake. Golf Links never had any expectation of receiving a conveyance of Lot 28 much less a house located on Lot 28.... The house on Lot 28 was built years ago, and was there for all to see. There was no intention that Lot 28 be conveyed at all. I believe that certain persons with Golf Links found out months after the closing that Lot 28 had been included in the description by mistake and that they are now attempting to exploit the mistake to their own advantage.

Letter dated July 3, 1997, from Orville Coward to Mark Pinkston, included in documents submitted under seal for *in camera* review.

## IV. DISCUSSION

As noted, Lawyers Title issued title insurance to Golf Links in connection with the purchase which included Lot 28. As a result, the insurer seeks reformation of the contract to delete that lot from its policy. However, prior to addressing that issue, it must be determined whether the parol evidence referenced herein is admissible, since only admissible evidence may be used in support of a motion for summary judgment. Fed.R.Civ.P. 56. Part of that determination involves whether the letter written by Coward to the attorney for Lawyers Title is inadmissible due to attorney-client privilege.

### A. Attorney-client privilege.

The Court has limited its review of the deposition testimony of Orville Coward to those areas received without objection. However, the issue of the privilege remains concerning the letter written by Coward to the attorney for Lawyers Title. Coward testified without objection that he sent the letter in order to alert the insurer that it should not pay the claim. Thus, a threshold showing has been made concerning the applicability of the privilege and the Court therefore conducted an *in camera* review of the document. *United States v. Zolin*, 491 U.S. 554, 571, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).

■ Coward certified title to Lawyers Title in order to obtain title insurance for his client, Golf Links. N.C. Gen.Stat. § 58–26.1(a) (Title insurance may not issue "unless and until the title insurance company has obtained the opinion of an attorney, licensed to practice law in North Carolina and not an employee ... of the [insurer], who has conducted ... a reasonable examination of the title."). When a claim was made under that policy by Golf Links, Coward, as the certifying attorney, was contacted by Lawyers Title. At that point, Coward was under an ethical obligation to respond truthfully to the inquiry.

Assuming *arguendo* that the attorney-client privilege attached, the Revised Rules of Professional Conduct provide an exception to it under such circumstances. "A lawyer may reveal ... confidential information concerning the intention of a client to commit a crime, and the information necessary to prevent the crime ... *confidential information to the extent the lawyer reasonably believes necessary to rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services were used ...* [and] *confidential information to the extent the lawyer reasonably believes necessary ... to respond to allegations in any proceeding concerning the lawyer's representation of the client....* " Rule 1.6 (emphasis added). Coward knew that Lot 28

was mistakenly included in the deed; he was under an ethical obligation to disclose this information to the insurer in order to prevent the possible perpetuation of a fraud. *Nix v. Whiteside*, 475 U.S. 157, 168, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("Indeed, both the Model Code and the Model Rules do not merely *authorize* disclosure by counsel of client perjury; they *require* such disclosure."); *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999); In re Grand Jury Proceedings, 102 F.3d 748, 752 (4th Cir.1996) ("The protective shield of the attorney-client ... privilege[ ] is appropriately pierced when a client attempts to use [it] to further criminal or fraudulent activities."); Ethics Opinion Note RPC 113 ("A lawyer may disclose information concerning advice given to a client at a closing in regard to the significance of the client's lien affidavit.").

█ Moreover, the undersigned concludes the communication between Coward and the attorney for Lawyers Title was not subject to the privilege. Golf Links retained Coward to represent it in connection with the closing, a substantial portion of which involved obtaining title insurance. Thus, Golf Links knew at all times that Coward would perform a title examination in order to obtain the insurance. His legal conclusions concerning that title would, of necessity, be disclosed to the insurer. In fact, those conclusions were disclosed when Coward certified title in order to obtain the insurance. Thus, when the insurer later inquired about those conclusions, Coward's response was likewise not covered by the privilege. In short, there was never any expectation that these matters would be confidential.

2. Although apparently not addressed by the Fourth Circuit, it also appears that "when a party to litigation takes an action which places information that is otherwise protected by the attorney-client ... privilege 'at issue,' the asserted privilege is impliedly waived." *In re Pfohl Bros. Landfill Litigation*, 175 F.R.D. 13, 24 (W.D.N.Y.1997) (citing *New York TRW Title Insurance Inc. v. Wade's Canadian Inn and Cocktail Lounge, Inc.*, 225 A.D.2d 863, 638 N.Y.S.2d 800 (3d Dept.1996)

[T]he mere fact the evidence relates to communications between attorney and client alone does not require its exclusion. Only confidential communications are protected. *If it appears by extraneous evidence or from the nature of a transaction or communication that they were not regarded as confidential, or that they were made for the purpose of being conveyed by the attorney to others,* they are stripped of the idea of a confidential disclosure and are not privileged.

*Hartsell v. Hartsell*, 99 N.C.App. 380, 393, 393 S.E.2d 570, 578 (1990) (emphasis added). This is precisely the case at hand. The nature of the transaction, *i.e.*, the purchase of the property and the acquisition of title insurance, required that the communications not be confidential. Of necessity, the information had to be conveyed to others, the insurer. Moreover, if the privilege attached, Golf Links waived it by instructing Coward to obtain title insurance.[2] *Hawkins v. Stables*, 148 F.3d 379, 384 n. 4 (4th Cir.1998) ("[I]mplied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege.... Furthermore, such a disclosure not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure.").

## B. Admissibility of parol evidence.

█ "The parol evidence rule, as frequently phrased, prohibits the admission of parol evidence to vary, add to, or contradict a written instrument." *Brandis & Brown on North Carolina Evidence*, § 258

(defendant's contention that he never intended to create a mortgage placed parties' intention at issue thereby waiving the attorney-client privilege)); *see also, Belmont Textile Machinery Co. v. Superba*, 48 F.Supp.2d 521, 523 (W.D.N.C.1999) (Party claiming his conduct was not wilful because done in reliance on legal advice may not assert such defense without disclosing communications with attorney).

(5th ed.1998). However, the "parol evidence rule presupposes the existence of a legally effective written instrument. It does not in any way preclude a showing of facts which would render the writing inoperative or unenforceable. Thus, it may be proved that . . . there was such mistake as to prevent the formation of a contract or make it subject to reformation . . . ." *Id.*, at § 264.

"In an action to reform a deed for mutual mistake, parol evidence is admissible to prove that due to the mutual mistake of the parties, the deed does not express the actual intent of the parties." *Nelson v. Harris*, 32 N.C.App. 375, 378, 232 S.E.2d 298, 300 (1977). "Parol evidence is generally admissible to show grounds for granting a [reformation] even if the written agreement includes a merger clause." *Top Line Constr. Co. v. J.W. Cook & Sons, Inc.*, 118 N.C.App. 429, 434, 455 S.E.2d 463, 466 (1995).[3] Indeed, as recently as last year, the North Carolina Court of Appeals recognized without comment the admission of parol evidence to show that reformation of an insurance contract was warranted. *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 131 N.C.App. 438, 444–45, 509 S.E.2d 778, 782 (1998). The undersigned therefore concludes that the parol testimony recited herein is properly admissible.

**C. Reformation.**

" 'Reformation is a well-established equitable remedy used to reframe written instruments where, through mutual mistake . . . the written instrument fails to embody the parties' actual, original agreement.' " A mutual mistake is one shared by both parties to the agreement, such that each party operates under a misunderstanding as to the terms of the contract or the provisions of the writing intended to embody the agreement. Reformation is appropriate to effectuate the intended terms of the agreement, provided that "clear, cogent,

and convincing" evidence was presented to show that the parties intended the terms as reformed.

*Id.*, at 444, 509 S.E.2d at 782–83 (quoting *Metropolitan Property & Cas. Ins. Co. v. Dillard*, 126 N.C.App. 795, 798, 487 S.E.2d 157, 159 (1997)) (other citations omitted).

" '[N]egligence on the part of one party [which induces the mistake] does not preclude a finding of mutual mistake.' In other words, the fact that the mistake arises because the party who is seeking the reformation supplied the incorrect information does not make the mistake unilateral." *Metropolitan Property & Cas. Ins. Co.*, 126 N.C.App. at 798, 487 S.E.2d at 159 (quoting *Moreland v. State Farm Fire & Cas. Co.*, 662 S.W.2d 556, 563 (1983)). Therefore, the fact that the attorney for the seller mistakenly attached Exhibit A containing a description of Lot 28 is of no moment. The Defendant's attorney readily admitted he mistakenly allowed the description to remain in the contract and the deed.

The issue, then, is whether "clear, cogent and convincing" evidence has been produced to show mutual mistake. No one disputes that in 1984 the Tomlinsons bought Lot 28 and built their home thereon. Thus, for twelve years prior to the sale of Holly Springs to Golf Links, the Tomlinsons' recorded title showed their lot was not part of the Holly Springs tract. In fact, when the bankruptcy trustee foreclosed on Holly Springs in 1988, the deed contained a specific exception of Lot 28. The chain of title clearly showed the Tomlinsons' land was not part of the tract. And, the attorneys representing the parties to this action acknowledge that their failure to consult that chain of title caused the description of Lot 28 to be included in Exhibit A.

The sale contract between the Teamsters and Golf Links placed the onus on

---

**3.** The Court recognizes that the Plaintiffs seek reformation of the contract of insurance, not the contract of sale or deed. However, Defendant's arguments were addressed to reformation of the contract of sale and thus, this citation is made.

the buyer to ascertain the extent of the property. Pursuant to a bargained-for clause, Golf Links could terminate the contract within thirty days if the description was materially untrue. Yet, Golf Links made no such election because it, like the seller, was completely unaware that the description contained Lot 28.

Doyens testified that Trexler was "heavily" involved in revising the contract submitted by the Teamsters' attorneys, yet he did not revise any portion of the description. This is in accord with Trexler's testimony that he had "absolutely" no idea of the extent of property being purchased. And, Lot 28 was never included in the prospectus offering stock in Golf Links for sale. Rogers testified that Trexler, upon learning coincidentally of the existence of Lot 28, exclaimed that this mistake was going to result in a lawsuit for $750,000 in damages, exactly the amount owed the Teamsters under the promissory note. Trexler did not tell Rogers that Lot 28 was properly included in the deed; to the contrary, his remarks were that the mistake was a "blessing in disguise" and that "people make mistakes and they pay for them."

Defendant's sole defense is that Holly Springs was not purchased by Golf Links but by Trexler in his individual capacity. Thus, parol evidence may not be received because Golf Links has no rights or obligations under the contract. And, since he intended to purchase everything specified in Exhibit A, there was no mutual mistake and reformation is not appropriate. This argument is disingenuous at best. The "Offer to Purchase and Contract" clearly identifies the buyer of the property as Golf Links. Exhibit 1, *attached to* Plaintiffs' Motion. Trexler testified that he "was going to buy it and put it into an entity of my choosing, and that entity happened to be Golf Links ...." Trexler Deposition, at 12. "I was going to control the purchase of this property and determine how to title and to keep and to have and to hold this property for my self-interest." *Id.,* at 94. According to Trexler, he was the owner of the property because he was the controlling stockholder of the Golf Links corpora-

tion. Yet, Trexler admitted that the mortgage was extended to Golf Links and the deed was placed in the name of Golf Links, not Trexler. *Id.,* at 95, 122, 231, 271. And, despite Trexler's convoluted explanation of ownership, during his testimony he referred to Golf Links as the buyer and owner of the property. "Holly Springs was the first acquisition for Golf Links Development Corporation, correct." *Id.,* at 149.

The only facts disputed by the parties are Trexler's assertion that he was the buyer, not Golf Links, and his claim that he intended to buy everything listed in Exhibit A. However, "[a]lthough courts must carefully consider summary judgment when intent is an issue, '[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir.1995) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). When motivation is at issue, "naked opinion, without more," is insufficient to withstand summary judgment. *Yarnevic v. Brink's, Inc.,* 102 F.3d 753, 757 (4th Cir.1996). And, Trexler's version of the legal consequences of his intention to control Golf Links while purchasing Holly Springs is irrelevant. *Featherstone v. United Parcel Services, Inc.,* 56 F.3d 61 (table), 1995 WL 318596 (4th Cir.1995) (A laywitness' legal opinion is irrelevant).

> While it is axiomatic that Rule 56 must be used carefully so as not improperly to foreclose trial on genuinely disputed, material facts, the mere existence of some disputed facts does not require that a case go to trial. The disputed facts must be material to an issue necessary for the proper resolution of the case, and *the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict....* Thus, if the evidence is "merely colorable" or "not significantly probative," it may not be adequate to

oppose entry of summary judgment.... While we have recognized generally that when considering a motion for summary judgment, the district court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion," we hasten to add that *those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture.*

*Thompson Everett, Inc. v. National Cable Adver.,* 57 F.3d 1317, 1323 (4th Cir.1995) (emphasis added) (citations omitted). Such is the case at hand. Trexler could not recall when he first became of the opinion that he owned Lot 28. At the closing, he was as unaware as Holly Springs that the proposed deed contained a mistake. Trexler's claim that he intended to buy everything listed in Exhibit A, and thus, Lot 28, requires inferences which do not fall with the range of reasonable probability and does not present the quality or quantity of evidence warranting submission of this case to a jury. The Court therefore finds summary judgment appropriate.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiffs' motions *in limine* to allow the admission of evidence arguably subject to the attorney-client privilege and parol evidence are hereby **GRANTED**, and the Defendant's cross-motions *in limine* are hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the Defendant's motion to bar testimony or evidence from Gary Doyens is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the Defendant's motion for summary judgment is hereby DENIED, and the Plaintiffs' motion for summary judgment is hereby **GRANTED**.

Plaintiffs are directed to submit to the Court a proposed Judgment in accordance with the rulings herein within 15 days from entry of this Memorandum and Order.