**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1725**

JACQUE JOHNSON, JR.,

             Plaintiff - Appellant,

      v.

MECHANICS & FARMERS BANK,

             Defendant - Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Frank D. Whitney, District Judge.  (3:05-cv-00258-FDW)

Argued:  October 30, 2008          Decided:  January 23, 2009

Before WILKINSON, Circuit Judge, Samuel G. WILSON, United States District Judge for the Western District of Virginia, sitting by designation, and Henry E. HUDSON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Humphrey S. Cummings, CUMMINGS LAW FIRM, P.A., Charlotte, North Carolina, for Appellant.  Sheri Lea Roberson, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Richard L. Rainey, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jacque Johnson ("Johnson") appeals the district court's order granting his former employer, Mechanics & Farmers Bank ("the Bank"), summary judgment on his discrimination and retaliation claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34 (2000) ("ADEA") that arise out of the Bank's decisions to place him on probation, deny him incentive pay, and ultimately terminate his employment. We affirm.

## I.

From 1998 to 2005, Johnson worked in the Bank's Charlotte branches as City Executive, the senior officer and manager responsible for all Charlotte operations.[1] In 2004, when Johnson was 56 years old, the Bank's Charlotte operations were well below budget expectations for both loans and deposits, negatively affecting the Bank's budget as a whole. In May 2004, the Bank's Charlotte operations had a shortfall of approximately $4.5 million in loan production, an amount that erased budget surpluses in other cities and was principally responsible for the Bank's total shortfall of $1.4 million in budgeted loans.

---

[1] In 2004, the Bank's other City Executives were Stanley Green, Jr., age 65 (Raleigh), Evelyn Acree, age 42 (Winston-Salem), and Queron Smith, age 29 (Durham).

(J.A. 523.)[2] Although branches in other cities failed to meet their production goals each month for loans and deposits in 2004, the Charlotte operations frequently missed the mark by the widest margin. (J.A. 523-30.)[3]

With the Charlotte operations' poor performance as a backdrop, in the late summer and early fall of 2004, Wesley Christopher, Johnson's supervisor and the Bank's Senior Vice President and Banking Group Executive, offered Johnson two alternative jobs that he and others believed would better suit Johnson's skills. It is clear that Christopher intended to hire 38-year-old Kevin Price ("Price") to eventually fill the Charlotte City Executive position he expected Johnson to relinquish.

Christopher first offered Johnson the position of the Bank's Commercial Lending Manager, the supervisor of all four City Executives. After discussing the offer and demanding changes in the position, Johnson refused it twice because he

---

[2] In the same month, the Bank's Durham operations had a surplus of approximately $3.1 million in loans, the Raleigh operations had a deficit of $143,000, and the Winston-Salem operations had a surplus of $121,000. (J.A. 523.)

[3] At the end of 2004, the Bank's Charlotte branches were approximately $5.6 million (14.09%) below budget expectations in loans, and $3.2 million (9.94%) below budget expectations in deposits. Overall, the Bank finished about $14.3 million (7.63%) below budget in loans and about $740,000 (0.39%) above budget expectations in deposits. (J.A. 530.)

3

would not receive an "immediate salary adjustment" but instead would have to wait until March 2005 to gauge the adequacy of his performance in the new position. (J.A. 301.) According to Johnson, after his second refusal Christopher responded: "Jacque, let me be straight with you, we're concerned about your Charlotte operation and you have a Bull's Eye on your Chest." (J.A. 301.) Christopher then demanded an update by the following morning as to what Johnson was doing "to get Charlotte loans back on budget and timing." (J.A. 301.) Finally, on October 1, 2004 Christopher offered Johnson another job, a lateral position as Senior Underwriter, which Johnson also refused on that date.

Immediately after Johnson refused the Senior Underwriter position, Christopher placed Johnson on probation, citing the poor performance of the Bank's Charlotte branches in "key areas" including loans and deposits. (J.A. 297.)[4] Johnson responded by

---

[4] These events moved quickly. At 4:32 p.m. Christopher sent Johnson a job description for the Senior Underwriter position and required him to respond at once. (J.A. 739.) Johnson called and rejected the position, and at 5:44 p.m. Christopher placed him on probation, informing him that he was subject to termination if Charlotte's performance did not improve. (J.A. 749, 750-51.) Then, at 6:37 p.m., Christopher wrote Lee Johnson asking for permission to extend an offer to Kevin Price who Christopher intended to "eventually be the Charlotte City Exec." (J.A. 766.) He also recommended that the Bank "actively and vigorously pursue a quick and reasonable settlement" and began planning an "exit package" for Johnson. (J.A. 766-67.)

filing a grievance challenging Christopher's decision, calling his superior's conduct unprofessional, vindictive, and duplicitous, and adding that Christopher's own performance "should be called into question." (J.A. 299, 303.) Nevertheless, Christopher held open the Senior Underwriter position for Johnson. But despite further entreaties from Christopher, Johnson refused to speak with Christopher about the position and in a variety of correspondence with senior officers and directors characterized Christopher's entreaties as "harassing." (J.A. 343-45.)[5] As a result, Lee Johnson, the Bank's President and Chief Executive Officer, wrote Johnson on October 22, 2004 that many of Johnson's communications within the Bank, separate and apart from his grievance concerning his probation, were "insubordinate and unprofessional" and that "any further deviations . . . [would] result in immediate termination." (J.A. 384.) However, Lee Johnson also struck a conciliatory chord, noting his belief that Johnson was "fully capable of continuing to be a productive employee." (J.A. 384.)

As anticipated, the Bank hired Price to serve as Charlotte's Vice President and Senior Business Development

---

[5] Johnson also filed a grievance complaining that Christopher had directed him to apply "inconsistent, illogical, and wrongful disciplinary action to subordinates . . . ." (J.A. 392.)

Officer, a new position.  Price coordinated with Johnson to support the Bank's sales and production, but reported directly to the Bank's corporate office.

On November 1, 2004 Lee Johnson wrote Johnson that he was setting aside Johnson's probation, although the gist of the letter mirrored his October 22 letter, warning that Johnson was expected "to fully execute [his] responsibilities as the City Executive of Charlotte" and that "any further deviations . . . [would] result in immediate termination."  (J.A. 385.)  Again, Lee Johnson noted his belief that Johnson was "fully capable of continuing to be a productive employee."  (J.A. 385.)

Johnson filed an age discrimination charge with the Equal Employment and Opportunity Commission ("EEOC") claiming that the Bank had not disciplined others who had not met their production goals and had hired a younger person who was "slated to replace [Johnson] as City Executive."  (J.A. 387.)[6]  He also claimed that during the discussions concerning the new positions, his superiors made two statements revealing their aged-based animus: first, Christopher allegedly told him the Bank was looking for "young blood," and second, Lee Johnson called Johnson "the 'God Father' of the City Executives."  (J.A. 387.)

_____

[6] Johnson filed the charge on October 27, 2004 after Lee Johnson chastised him for his insubordinate tone but several days before Lee Johnson set aside his probation.

More than two months later, Christopher sought advice from a management consultant concerning a plan to terminate Johnson on January 7, 2005 "due to performance issues." (J.A. 859.) On January 5, 2005, the consultant wrote Christopher concerning "the process of removing a key executive." (J.A. 860-62.) Lee Johnson raised questions, however, and wanted to speak with the Bank's attorney since the Bank had been responding to Johnson's EEOC charge. Lee Johnson thought it was "important" that he "understand the overall evaluation of comparable individuals" and asked whether the Bank had "completed a review of other city executives, executives that may not have met their goals." (J.A. 878.) He stated that, although he did not want to "delay unnecessarily," he believed the Bank "need not rush to judgment" given its "prior start." (J.A. 878.)

On March 25, 2005, Steven Savia, an outside consultant who frequently worked on the Bank's personnel matters, issued a report on each City Executive's eligibility for incentive pay for 2004. According to the Bank's formula, if the Bank as a whole reached a given threshold net income for the year, individual employees could qualify for incentive pay based on their performance in certain criteria. For City Executives, the incentive pay criteria included growth in loans, deposits, other objective measures, and a partially-subjective, overall performance evaluation. Based on Savia's report, all City

7

Executives except Johnson received incentive pay for 2004. On March 28, 2005, Johnson filed a second EEOC charge, alleging that the Bank had denied him incentive pay on account of his age or in retaliation for his previously-filed EEOC charge.

On April 26, 2005, an altercation occurred at one of the Bank's Charlotte branches between two employees, Leslie Cato and Lori Corpening. Christopher hired Savia to investigate the incident. Savia interviewed Cato, Corpening, and others involved in the incident and viewed a security camera recording before reaching the following conclusions:

> Based on these [third-party] accounts, it appears clear that Ms. Cato was in fact the aggressor. There is also a reasonably consistent account of the language and intensity of Ms. Cato's actions. There is agreement that Ms. Cato had to be restrained and required a strong effort to calm her. Ms. Corpening had a colleague stand with her on the lobby side of the breezeway door with Ms. Cato being restrained on the other side continuing to curse and threaten Ms. Corpening.

(J.A. 1565.) Based on this report, on May 3, 2005 Christopher directed Johnson to fire Cato and transfer Corpening. Rather than follow this directive, however, on May 6, 2005 Johnson requested a copy of Savia's report for his own review, stating that he did not wish to expose the Bank to an "unfounded lawsuit" by firing Cato. (J.A. 1568.) In an email to Christopher on May 9, 2005, Johnson wrote,

> I am deeply disappointed with your entire memo dated May 3, 2005, concerning the incident between Lori

8

[Corpening] and Leslie [Cato] on April 26, 2005. Your memo is vague, and there is a lot to be desired in the area of clarity, truth, and understanding. . . .

Steve Savia, your paid consultant, was very transparent in his interviews, and I'm sure his analysis of the incident is tainted as well. . . . [D]ue to his [Savia's] bias perpetrated by your direction and his desire for commissions, you and he continue to spin results which creates a diametrically opposite analysis of the incident.

(J.A. 1569.) Despite the insubordinate tone of Johnson's email, Christopher complied with Johnson's request and sent him Savia's report. Johnson reviewed the report, and wrote Christopher that he had reached the opposite conclusion, that Corpening was the aggressor in the incident, and further that

*Steve* [Savia] *should be criticized for his unreliable and unprofessional report*. His extremely negligent investigative process was lacking in proper due diligence. . . . My recommendation is that Mr. Savia, your paid consultant, obtain proper training in his fact gathering techniques and the logical analysis of data required to complete a competent and unbiased investigation prior to his next assignment, if any.

(J.A. 1575.) Johnson never fired Cato. On May 23, 2005, Christopher and Lee Johnson fired Johnson, citing his insubordination and previous poor performance. Price and Tanya Dial-Bethune, age 42, performed Johnson's duties until the Bank hired Johnson's 57-year-old replacement on June 26, 2006.

Johnson filed a third EEOC charge, alleging that the Bank had terminated him on account of his age and in retaliation for his previously-filed EEOC charges, and he ultimately filed suit in district court. In an oral opinion delivered at the

9

conclusion of the summary judgment hearing, the district court granted the Bank summary judgment as to all claims.

## II.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review a district court's grant of summary judgment de novo, viewing the evidence and making all reasonable inferences in the light most favorable to the nonmoving party. Sempione v. Provident Bank of Md., 75 F.3d 951, 954 (4th Cir. 1996).

## III.

Johnson maintains his evidence, viewed either through a mixed-motive framework or through a modified paradigm of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), raises a triable issue of fact that the Bank placed him on probation on account of his age. The Bank maintains that Johnson's probation, which it set aside within 30 days, was not an adverse employment action, and that Johnson has otherwise failed to create a triable issue of fact. We conclude under a mixed-motive analysis that Johnson has failed to marshal

10

sufficient evidence for a reasonable jury to conclude that his age was a determinative influence on the Bank's decision to place him on probation. We also agree with the district court, that Johnson failed to establish a prima facie case under McDonnell Douglas because he failed to demonstrate that he was meeting the Bank's legitimate expectations (based upon the Bank's relatively poor performance in the Charlotte area as measured by a shortfall in budget expectations for both loans and deposits). Essentially for the same reason, we also conclude that the Bank has articulated a legitimate, non-discriminatory reason for placing Johnson on probation which Johnson has not shown to be a pretext for discrimination. Accordingly, the district court properly entered summary judgment for the Bank on that claim.

### A.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000). Under the "mixed motive" proof scheme, an employee may demonstrate that permissible and forbidden reasons motivated his employer to take adverse employment action. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc). Mixed-motive cases require the employee to prove

11

that the protected trait "'actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" Id. at 286 (quoting Reeves, 530 U.S. at 141); cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 276-77 (1989) (O'Connor, J., concurring). Under a mixed-motive analysis, the question distills to whether Johnson has marshaled sufficient evidence for a reasonable jury to conclude that age was a determinative influence on the Bank's decision to place him on probation. We conclude that he has not.

We have previously assumed without deciding that Price Waterhouse continues to govern the ADEA mixed-motive framework. Under that framework, an employee must marshal direct evidence of discrimination to satisfy his burden of proof. E.E.O.C. v. Warfield-Rohr Casket Co., Inc., 364 F.3d 160, 163 n.1 (4th Cir. 2004). This is because the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended in scattered sections of 42 U.S.C.) (2000), amended Title VII without similarly amending the ADEA, and in any event, "maintaining the higher evidentiary burden in Price Waterhouse for ADEA claims is not implausible, given that age is often correlated with perfectly legitimate, non-discriminatory employment decisions." Mereish v. Walker, 359 F.3d 330, 340 (4th Cir. 2004). In the employment context, direct evidence of discrimination is "evidence of conduct or statements that both reflect directly on

12

the alleged discriminatory attitude and that bear directly on the contested employment decision." Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) (en banc), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Johnson contends that two statements made in the context of offering him alternative positions are direct evidence of the Bank's discriminatory animus: Christopher told Johnson that the Bank wanted to bring in "young blood," and Lee Johnson referred to him as "the Godfather." Despite considerable underperformance by the Bank's Charlotte operations, Johnson contends these statements, coupled with the timing of his probation, create a triable issue of fact under a mixed-motive analysis that age was a determinative influence on the Bank's decision to place him on probation. We disagree.

Viewed in its totality, without regard to its direct or circumstantial nature, we find the evidence insufficient for a reasonable jury to conclude that Johnson's age was a determinative influence on the Bank's decision to place him on probation. From May through September 2004, the Bank's uncontradicted evidence reveals Charlotte's chronic failure to meet its loan production budget. During this time, the Charlotte branches were on average about 10% behind their loan budget, each month lagging behind to the tune of several million dollars. (J.A. 523-27.) Operations in other cities, in

13

contrast, either met their loan production budget or only slightly underperformed. Charlotte's consistent shortfall was primarily responsible for the Bank's inability to meet its overall loan budget: in September 2004, for example, when the Bank was about $5.6 million behind its loan budget, about $4.3 million of that deficit belonged to Charlotte. (J.A. 527.) The same pattern appears with deposits: Charlotte never met its deposit production goals during this time period; in September 2004, for example, while the Bank exceeded its overall deposit goal by $4.7 million, Charlotte was more than $4.2 million behind its deposit goal. (J.A. 523-27.)

Given the consistently poor financial performance of the Charlotte operations, two ambiguous, stray comments in the course of offering Johnson lateral positions his supervisors have described as a "better fit" for his abilities are not sufficient to create a triable issue of fact that the Bank placed Johnson on probation on account of his age. Nor do we find the timing of the decision probative of age discrimination. Johnson's superiors believed Johnson was impeding their efforts to turn around the Bank's Charlotte operations. As they viewed it, he was in the way and would not move. Although Johnson contends that his probation was discriminatory because other City Executives had also failed to meet their budget expectations, the uncontradicted evidence supports the

14

conclusion that the Charlotte office frequently missed the mark by the widest margin. Under the circumstances, the Bank was free to place Johnson on notice that it would penalize or replace him if its Charlotte operations did not improve. Accordingly, we find insufficient evidence under a mixed-motive framework for a reasonable jury to conclude that age was a determinative influence on the Bank's decision to place Johnson on probation.[7]

                                    B.

Johnson maintains that his placement on probation raises a triable issue of age discrimination under the second proof scheme available to him – the McDonnell Douglas scheme. The district court found that Johnson failed to establish a prima facie case under McDonnell Douglas for several reasons, including Johnson's inability to show that his performance met his employer's legitimate expectations concerning the performance of the Bank's Charlotte operations. It also found that even if Johnson had established a prima facie case, the

---

[7] We have previously held that ADEA mixed-motive cases remain subject to the Price Waterhouse analysis, which allows an employer to avoid liability with proof that "it would have taken the same adverse employment action absent a discriminatory motive." See Baqir v. Principi, 434 F.3d 733, 745 n.13 (4th Cir. 2006). Because we find insufficient evidence of age-based animus, we have no reason to decide whether the Bank would have placed Johnson on probation absent any age-based animus.

15

Bank offered un-rebutted evidence that it placed him on probation for a legitimate, non-discriminatory reason – underperformance in Charlotte's operations as measured by loans and deposits.  We agree.

To establish a prima facie case under the McDonnell Douglas framework, the employee must prove that (1) he is a member of a protected class; (2) who suffers an adverse employment action; (3) at the time of the action, his performance was satisfactory to meet his employer's legitimate expectations, and (4) he was treated less favorably than persons who are not members of the protected class.  See E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992).  If he does so, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action.  Hill, 354 F.3d at 285.  When the employer meets its burden, the McDonnell Douglas framework "disappear[s] and the sole remaining issue [is] discrimination vel non."  Id. (quoting Reeves, 530 U.S. at 142-43).  The employee then has the ultimate burden to prove that the employer's proffered reasons were but a pretext for discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993); see also Hill, 354 F.3d at 285.

The Bank argues that Johnson has not established a prima facie case because a one-month probationary period that is set aside is not an adverse employment action (element two under

16

McDonnell Douglas) and because he failed to prove he was meeting his employer's legitimate expectations (element three). Alternatively, the Bank argues that it placed Johnson on probation for a legitimate and non-discriminatory reason, namely its Charlotte operations were significantly underperforming in both loans and deposits. In attacking this reason as pretextual, Johnson marshals essentially the same evidence he offered in his mixed-motive analysis.

We agree with the district court that Johnson has failed to establish a prima facie case under McDonnell Douglas because he has failed to show that he was meeting the Bank's legitimate expectations for its Charlotte operations.[8] However, whether considered at the prima facie case stage or at the pretext stage, his claim collapses for the same reason: Charlotte operations were substantially underperforming in loans and

---

[8] "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). When the legitimate expectations of an employer are at issue on summary judgment, both the employer and the employee may present evidence of the expectations themselves and their legitimacy. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 515-17 (4th Cir. 2006). In evaluating performance, "[i]t is the perception of the decision maker which is relevant." Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). Though Johnson claims that Christopher's budget expectations for Charlotte were higher than those for other cities, nothing he has marshaled demonstrates they were not legitimate.

deposits.  Accordingly, we agree with the district court that Johnson has not raised a triable issue of fact under the McDonnell Douglas proof scheme.


IV.

Johnson maintains that the Bank denied him incentive pay in March of 2005, for his 2004 performance, based on age and in retaliation for filing his initial EEOC charge.  The Bank maintains it denied him incentive pay because he did not qualify for it under the Bank's incentive pay formula, as applied by its consultant, which in large measure factored in loans and deposits.  For essentially the same reasons we concluded earlier that Johnson failed to raise a triable issue of fact either under a mixed-motive or McDonnell Douglas proof scheme concerning his probation, we conclude that the district court properly entered summary judgment on Johnson's age discrimination claim for the Bank's denial of incentive pay. For similar reasons, we also conclude that the district court properly entered summary judgment as to his retaliation claim.

A.

We see no necessity in repeating the Bank's "underperformance in loans and deposits" refrain here, which we again conclude sufficiently supports the Bank's decision.  We note, however, that from the Bank's perspective, in addition to

18

missing his budget for loans and deposits more often by the widest margin of any of the four City Executives, by the time of Johnson's performance review, the Bank's CEO had warned Johnson (before he complained of age discrimination) about the disrespectful and insubordinate tone of his correspondence within the company. Under the circumstances, Johnson is unable to show either under a mixed-motive proof scheme that age was a determinative influence on the Bank's decision to deny him incentive pay or under the McDonnell Douglas proof scheme that his performance was meeting his employer's legitimate expectations.[9]

## B.

Johnson claims the Bank denied him incentive pay in retaliation for his EEOC charge. He argues that the January 2005 email exchange discussing Christopher's plan to terminate him reveals retaliatory animus. The Bank counters that nothing in those emails remotely suggests retaliation. It argues that

---

[9] In calculating incentive pay the Bank rounded upward the overall performance evaluation scores of the two City Executives who performed better overall on the objective measures of loan and deposit growth and rounded downward the overall performance evaluation scores of the other two. Johnson claims that this practice is evidence of disparate treatment because it worked to the advantage of two younger City Executives and to the disadvantage of Johnson and the other older City Executive. Johnson, however, offered nothing to suggest that the rounding was not performance-based or was anything other than a coincidental correlation with age.

the evidence is insufficient to establish a prima facie case of retaliation and, alternatively, that even if Johnson established a prima facie case of retaliation, he did not receive incentive pay because of his performance. We assume without deciding that Johnson's evidence establishes a prima facie case of retaliation, but we find that Johnson has not created a triable issue of fact that the Bank's proffered reasons for denying him incentive pay were pretextual.

An employer violates the ADEA by retaliating against an employee for engaging in a protected activity. 29 U.S.C. § 623(d) (2000). The elements of a prima facie case of retaliation are (1) the plaintiff engaged in a protected activity, (2) the employer took an adverse employment action against the plaintiff, and (3) a causal connection existed between the protected activity and the adverse employment action. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). If the employee establishes a prima facie case, the employer may rebut it by presenting evidence of a legitimate, non-retaliatory reason for the adverse action. Id. After the employer presents evidence of its legitimate, non-retaliatory reason, the burden shifts back to the employee to show that the employer's proffered reason is pretextual. Id.

Applying these standards, even assuming Johnson has established a prima facie case, we find that Johnson's evidence

20

does not demonstrate that the Bank's legitimate, non-retaliatory reason for denying him incentive pay – underperformance — was pretextual.  We agree with the Bank that the January 2005 email exchanges support no inference that the Bank's proffered reason for denying Johnson incentive pay was pretextual.  If anything, Lee Johnson's correspondence shows restraint.  He thought it important not to "rush to judgment" and to "understand the overall evaluation of comparable individuals."  (J.A. 878.) Accordingly, the district court properly granted summary judgment as to Johnson's retaliation claim arising from his denial of incentive pay.


V.

Johnson maintains that the Bank terminated him on account of his age and retaliated against him for filing EEOC charges and for opposing Christopher's directive to terminate Cato following her conflict with her co-employee.  The Bank counters that it terminated Johnson because Johnson added insubordination to the Bank's original concerns about his performance.  The court concludes that Johnson has offered nothing new to support his age discrimination claim, whether considered under a mixed-motive or McDonnell Douglas framework, that he has not shown that the Bank's proffered reasons are a pretext for retaliation, or that his refusal to fire Cato was protected opposition

21

activity. Accordingly, the district court properly granted the Bank's motion for summary judgment as to Johnson's termination claims.

## A.

Other than the fact of termination and the assignment of his duties to two other existing employees, Johnson offers nothing new to support his age discrimination claim. However, these facts lend no support to his claim that his age played a role in his termination. Indeed, Johnson had clearly become insubordinate and insolent in dealing with his superiors. Rather than obey Christopher's orders to fire Cato and transfer Corpening, Johnson demanded to see a copy of Savia's report, then called that report and Christopher's analysis of it tainted, unclear, and untruthful. Under the circumstances, no reasonable jury could conclude that the Bank terminated him on account of his age or, for essentially the same reason, because he filed a charge of discrimination with the EEOC. Therefore, the district court properly granted summary judgment on these claims.

## B.

Johnson offered nothing in the district court that positioned his refusal to fire Cato as legitimate, protected "opposition activity." Accordingly, we find no fault in the

district court's decision granting the Bank summary judgment on that claim.

The ADEA, like Title VII, prohibits an employer from retaliating against an employee who has opposed unlawful discrimination.  Compare 29 U.S.C. § 623(d) (2000) (stating it is unlawful for "an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful" under the ADEA) with 42 U.S.C. §2000e-3(a) (stating it is "an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice" under Title VII).

"Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998).  As we have said in the closely analogous Title VII context, in determining whether an employee engages in legitimate opposition activity, "we balance the purpose of the Act to protect persons *engaging reasonably* in activities opposing . . . discrimination against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel."  Id. (internal citations and quotations omitted and emphasis

23

added).  Although the retaliation claimant does not have to show that the underlying discrimination claim was meritorious to prevail on a related retaliation claim, he must show that he "*subjectively* (that is, in good faith) believed" that his employer violated the ADEA, and that his belief "was *objectively* reasonable in light of the facts."  See Peters v. Jenney, 327 F.3d 307, 321 (4th Cir. 2003) (applying Title VII retaliation standard in Title VI context) (internal citations and quotations omitted).  "Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue may be resolved as a matter of law." Jordan v. Alternative Res. Corp., 458 F.3d 332, 339 (4th Cir. 2006).  With these precepts in mind we turn to Johnson's claim that he engaged in protected opposition activity when he refused to terminate Cato.

Johnson argues that he reasonably believed he was free to disregard his superior's directives to fire Cato because it was retaliatory.  We assume that Johnson in fact believed what he says he believed.  However, we find that belief to be objectively unreasonable.  We also find under a balancing test that Johnson did not engage reasonably in activities opposing discrimination.  Johnson's superior hired a consultant to investigate the incident between Cato and Corpening.  After an investigation, that consultant prepared a reasoned report

24

concluding that Cato was the aggressor, that she continued to curse and threaten Corpening, and another Bank employee had to restrain her. Right or wrong, that was his conclusion, and he passed it along to Johnson's superiors, and they directed Johnson to terminate Cato. Johnson had no liberty to disregard that directive based on his own machinations and unsupported speculation about Savia's and the Bank's motivations.

We also find that Johnson's opposition activities are not protected because the manner of his communications with Christopher was unreasonable. Again, it is fundamental that to receive protection Johnson must be "engaging reasonably in activities opposing . . . discrimination." Laughlin, 149 F.3d at 259. Recognizing this fact, Johnson attempts to characterize his May 6, 2005 email to Christopher as an effort "to seek guidance from Christopher." (Appellant's Reply Br. 24.) It is clearly no such thing when considered together with his follow-up May 9 email which could not reasonably be considered earnestly and respectfully seeking new information. The tone of the May 9 email is unmistakably insubordinate and insolent, the very things Lee Johnson had warned him about before. Therefore, the district court properly entered summary judgment for the Bank as to Johnson's retaliatory discharge claim.

VI.

For the foregoing reasons, we affirm the district court's decision to grant summary judgment for the Bank.

<u>AFFIRMED</u>